UNITED STATES of America, et
al., Plaintiffs, Appellees,

v.

CHARLES GEORGE TRUCKING, INC.,
et al., Defendants, Appellants.

Nos. 93–1691, 93–2372.

United States Court of Appeals,
First Circuit.

Sept. 13, 1994.

Richard E. Bachman, with whom John A. King and Hale, Sanderson, Byrnes & Morton, were on brief, for appellants.

John C. Cruden, with whom Louis J. Schiffer, Acting Asst. Atty. Gen., Robert H. Oakley, David W. Zugschwerdt, David C. Shilton, and Elizabeth A. Peterson, Attys., U.S. Dep't of Justice, and Ruthann Sherman, Office of Regional Counsel (EPA), for the federal appellee.

Scott Harshbarger, Atty. Gen., Karen McGuire and Margaret Van Deusen, Asst. Attys. Gen., and Nancy Preis, Sp. Asst. Atty. Gen., on brief for appellee Com. of Massachusetts.

Paul B. Galvani, with whom Thomas H. Hannigan, Jr., Jay Bradford Smith, and Ropes & Gray were on brief, for various appellees.

Laurence M. Johnson, Fordham & Starrett, Michael D. Chefitz, and Gilberg, Kurent & Kiernan, on brief for appellees Charles George, Jr., et al.

Mark S. Granger and Morrison, Mahoney & Miller on brief for appellee Boston Edison Co.

Before SELYA and CYR, Circuit Judges, and ZOBEL,[*] District Judge.

SELYA, Circuit Judge.

These appeals arise out of two consent decrees that together resolve a majority of the cost recovery disputes associated with the cleanup of a hazardous waste site in Tyngsboro, Massachusetts (the Site). Appellants, who are the principal owners and operators of the Site,[1] strive to convince us that the district court misjudged the relevant goals of the Comprehensive Environmental Response, Compensation, & Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675, and, therefore, erred in placing its imprimatur on the decrees. We are not persuaded.

## I. BACKGROUND

This litigation dates back to 1985, when the United States and the Commonwealth of Massachusetts filed separate cost recovery actions, soon consolidated, against appellants and other alleged owner-operators (collectively, "the junior Georges"), including Charles George, Jr. and James George (children of Charles and Dorothy George), and the sons' firm, C & J Trucking Co. The federal government's complaint alleged claims under 42 U.S.C. §§ 9604(a), 9604(b), 9604(e), 9607(a), 6928(a) & 6928(g). The Commonwealth's complaint alleged claims under 42 U.S.C. § 9607(a) and Mass.Gen. Laws ch. 21E, § 5.

The early procedural history of the struggle is described in a previous opinion of this court, *see United States v. Charles George Trucking Co.*, 823 F.2d 685 (1st Cir.1987), and need not be revisited. Thereafter, acting on plaintiffs' motions for partial summary judgment, the district court adjudged appellants to be jointly and severally liable for the costs of cleanup. However, the court left

---

[*] Of the District of Massachusetts, sitting by designation.

1. Charles George, his wife Dorothy George, Charles George Trucking, Inc., and Charles

George Land Reclamation Trust appear as appellants. We are not required to differentiate among them.

open the question of the junior Georges' liability due to factual disputes anent the degree of control that they exercised over the Site.

In June of 1989, plaintiffs amended their complaints to add twenty-four generator and transporter defendants. In turn, these defendants brought third-party claims for contribution against thirty-one other putative generators. They also filed counterclaims against the plaintiffs, charging negligent regulation. Appellants emulated this tactic, serving similar counterclaims.

The district court intervened to impose some structure on this welter of claims and cross-claims. By a case management order (CMO) dated April 12, 1990, Judge Woodlock deemed the third-party defendants to have asserted all available cross-claims and counterclaims against other parties, but precluded the plaintiffs from asserting claims directly against the third-party defendants. The judge supplemented the CMO in a subsequent bench ruling through which he limited development of so-called trans-shipment issues, that is, issues involving wastes hauled to the Site after first being dumped elsewhere.

By the fall of 1991, the dust had settled. A new round of summary judgment motions had been heard (most were denied), and trialworthy issues had been identified as to the liability of all defendants, save only the appellants, and as to virtually all aspects of the remedial phase. Unresolved questions also remained as to the counterclaims asserted against the plaintiffs. The likelihood of lengthy litigation loomed large.

Before too long, settlement negotiations began in earnest. After a fitful start, the district court appointed Chief Judge Tauro as a settlement master.[2] Numerous meetings among the parties yielded an agreement by the plaintiffs, in essence, to extinguish all claims against the generators and transporters (including the third-party defendants) in exchange for a global "cash-out" payment of approximately $36,000,000. The generators

and transporters were to decide among themselves how to share the aggregate cost of the settlement. The federal and state governments agreed to contribute an additional $3,103,712 as a token of their responsibility. After further negotiations, again held under Judge Tauro's auspices, the plaintiffs and the junior Georges also reached an accord, proposing to extinguish the latters' liability in return for a payment of $3,100,000. Though appellants participated in bargaining sessions from time to time, they eventually withdrew from the negotiations. The claims against them remain unresolved.

The settling parties prepared two proposed consent decrees. They presented the first, embodying the settlement reached by the plaintiffs with the generators and transporters, to the district court on December 17, 1992. They presented the second, embodying the plaintiffs' suggested settlement with the junior Georges, on July 27, 1993. Both were advertised in the Federal Register, see 28 C.F.R. § 50.7, but elicited no public comment.

At a hearing held on May 24, 1993, Judge Woodlock applied the standards set forth in *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 85 (1st Cir.1990), and found the generator/transporter decree to be reasonable, fair, and faithful to CERCLA's objectives. Following a separate hearing held on November 12, 1993, the court made similar findings in regard to the second decree. Judge Woodlock entered both decrees under Fed.R.Civ.P. 54(b), thus permitting appellants, as the lone objectors, to prosecute these appeals.

## II. STANDARD OF REVIEW

▇▇▇ Despite appellants' animadversions, *Cannons* has not rusted. It teaches that CERCLA consent decrees must be reasonable, faithful to the statute's objectives, and fair (both procedurally and substantively). *Cannons,* 899 F.2d at 85. The battle over whether a particular decree achieves these benchmarks will usually be won or lost in the

2. Judge Tauro is the Chief Judge of the United States District Court for the District of Massachusetts. We applaud Judges Tauro and Woodlock for their creative approach to the resolution of this complex case. We urge other jurists to consider collaborative efforts of this sort when circumstances warrant.

trial court. By the time such decrees arrive on the doorstep of the court of appeals, they are "encased in a double layer of swaddling." *Id.* at 84. In the first place, a trial court, without abdicating its responsibility to exercise independent judgment, must defer heavily to the parties' agreement and the EPA's expertise. *See id.* In this case, the inner layer of swaddling is especially thick because of the role played by the distinguished special master in overseeing negotiations. The second basis for deference is equally compelling. Because an appellate court ordinarily cannot rival a district court's mastery of a factually complex case—a mastery that is often, as in this instance, acquired through painstaking involvement over many years—the district court's views must also be accorded considerable respect.

Largely in consequence of these layers of protective swaddling, an appellate tribunal may overturn a district court's decision to approve or reject the entry of a CERCLA consent decree only for manifest abuse of discretion. In this case, then, the decision below stands unless the objectors can show that, in buying into either or both of the decrees, the lower court made a serious error of law or suffered a meaningful lapse of judgment. *See id.*

## III. DISCUSSION

Appellants advance four sets of arguments in support of their claim that the district court too freely accepted the proposed settlement. We proceed to examine each of the four components that comprise this asseverational array.

### A. *Reasonableness.*

■ A CERCLA consent decree is reasonable when it provides for an efficacious cleanup, and at the same time adequately compensates the public for the cost of that cleanup. *See id.* at 89–90. Efficacy is not merely a function of how close a settlement comes to meeting a scientifically defined ideal, nor is adequacy merely a function of how close a settlement comes to meeting an estimate of projected costs. These are, rather, pragmatic concepts, and evaluating them requires common sense, practical wisdom, and a dis-

passionate assessment of the attendant circumstances.

In this case, appellants question the efficacy of the proposed cleanup, and claim that they are entitled to an evidentiary hearing on the matter. In support of the first half of this objection, appellants do little more than plagiarize plaints from prior pleadings filed by other parties in opposition to plaintiffs' previous motions for partial summary judgment; they do not attempt to explain these points, fail to set forth supporting documents in a record appendix, and rely on rhetoric to the exclusion of either record citations or scientific fact.

■ We reject appellants' objection on two bases. First, it is presented to us in a slipshod fashion, without developed argumentation, and is, therefore, not entitled to substantive consideration. *See Ryan v. Royal Ins. Co.,* 916 F.2d 731, 734 (1st Cir.1990); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). Second, our independent review of the record leaves us confident that Judge Woodlock acted well within the realm of his discretion in concluding that the consent decrees incorporated a suitable set of remedies.

■ The second half of the objection is similarly unavailing. The district court did not err in declining to hold an evidentiary hearing to delve into matters of efficacy. Requiring hearings to review the reasonableness of CERCLA consent decrees as a matter of course would frustrate the statutory objective of expeditious settlement. *See Cannons,* 899 F.2d at 94. Consequently, requests for evidentiary hearings are, for the most part, routinely denied—and properly so—at the consent decree stage in environmental cases. *See, e.g., United States v. Metropolitan St. Louis Sewer Dist.,* 952 F.2d 1040, 1044 (8th Cir.1992); *State of Ariz. v. Motorola, Inc.,* 139 F.R.D. 141, 148 (D.Ariz. 1991); *United States v. Bliss,* 133 F.R.D. 559, 568 (E.D.Mo.1990); *United States v. Rohm & Haas,* 721 F.Supp. 666, 686–87 (D.N.J.1989) (collecting earlier cases). While a hearing may be necessary or desirable in special circumstances, *see, e.g., United States*

*v. Town of Moreau,* 751 F.Supp. 1044, 1051 (N.D.N.Y.1990), such cases are relatively rare.

This case invokes the general rule, not the long-odds exception to it. The court had ample information before it, and, even without an evidentiary hearing, the parties had "a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions." *Aoude v. Mobil Oil Corp.,* 862 F.2d 890, 894 (1st Cir.1988). Moreover, appellants have pointed to nothing out of the ordinary that would suggest a particularized need for an evidentiary hearing. Under these circumstances, we turn a deaf ear to appellants' lament.[3]

### B. *Fidelity to the Statute.*

Among the overarching goals of CERCLA recognized by the courts are "accountability, the desirability of an unsullied environment, and promptness of response activities." *Cannons,* 899 F.2d at 91. Appellants insist that Judge Woodlock's endorsement of the consent decrees undermined one of these goals—accountability—in two separate ways.

■ Appellants' main argument is that the allocation method embodied in the first consent decree failed to specify each individual generator's and transporter's degree of culpability. As a factual matter, appellants are correct; the consent decrees did no more than assign payment responsibilities to classes of potentially responsible parties (PRPs), leaving the question of allocation *inter sese* to the class members themselves. But we see no reason to prohibit such an approach. Realistically, a government agency, in the midst of negotiations, is in no position to put so fine a point on accountability. We, therefore, endorse, in general, EPA's practice of negotiating with a representative group of PRPs and then permitting the group members to divide the burden of the settlement among themselves.

This is, as one court has said, a "practical and reasonable process for achieving settlements." *United States v. Acton Corp.,* 733 F.Supp. 869, 873 (D.N.J.1990). It is also faithful to CERCLA's goals. After all, the ultimate measure of accountability in an environmental case is the extent of the overall recovery, not the amount of money paid by any individual defendant.

Over and beyond these generalities, there is an especially compelling reason for accepting a class-wide allocation here. Judge Woodlock supportably found that appellants' records were wholly inadequate. A lack of reliable records renders it impossible, as a practical matter, for a court to make reasoned findings concerning the relative contributions of particular generators or transporters to the aggregate harm. So it is here. And, moreover, because the shortage of records can be directly attributed to appellants' stewardship of the Site, they can scarcely be heard to complain that the settling parties resorted to, and the court then approved, a class-wide allocation.

■ Appellants' fallback position is predictable: in a refrain evocative of one of their attacks on the decrees' reasonableness, *see supra* note 3, they insinuate that the first consent decree compromised the goal of accountability by setting too modest a price tag on the generator/transporter settlement. Appellants have an easily envisioned stake in this aspect of the matter: as the sole nonsettling defendants, they are potentially liable for the full difference between the costs of cleanup and the total amount paid by the settling PRPs. *See* 42 U.S.C. §§ 9613(f)(2), 9622(h)(4); *see also United Technologies Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96, 102–03 (1st Cir.1994) (explaining interface between settlement and liability of PRPs for contribution in CERCLA cases). If, say, the overall clean-up costs eventually total $70,000,000—the highest of the differing estimates that have been bandied about—appellants are staring down the barrel of a $21,000,000 shortfall. Appellants claim their aggregate net worth amounts to only a tiny fraction of this exposure. On this basis, they contend that the plaintiffs sold out too cheaply, for many of the settling parties have very deep pockets.

---

**3.** Appellants also disparage the adequacy of the generator/transporter settlement from a financial standpoint. As we explain in Part III(B), *infra,* their criticism is unfounded.

■ Although we understand appellants' consternation, these considerations are virtually irrelevant. In the first place, the district court found that appellants are liable for all clean-up costs—and that finding is not disputed on appeal. As is true of any assessment of compensatory damages, the liable party's ability to pay should not influence the amount of the assessment. *See generally* 22 Am.Jur.2d *Damages* § 952 (explaining that evidence of a defendant's pecuniary resources is generally inadmissible in cases where only compensatory damages are recoverable); *Vasbinder v. Ambach*, 926 F.2d 1333, 1344 (2d Cir.1991) (applying principle).

■ To be sure, at the next step relative wealth may have some practical bearing. When defendants are jointly and severally liable, the prevailing party may choose to collect the entire indebtedness from one or more of the liable parties, to the exclusion of others. *See, e.g., McDonald v. Centra*, 118 B.R. 903, 914 (D.Md.1990), *aff'd*, 946 F.2d 1059 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2325, 119 L.Ed.2d 244 (1992). But when, as in this case, liability is contested, much more than the PRPs' relative affluence must be considered.

■ With this in mind, the proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified.

Inspected through that lens, the first consent decree looks entirely appropriate. The district judge explicitly found that the generators and transporters collectively were responsible for fifty percent of the environmental damage. Under the terms of the negotiated settlement, the payment to be tendered by the generators and transporters as a group (approximately $36,000,000) represents more than half of the highest estimate of aggregate clean-up costs ($70,000,000). Thus, the settlement is favorable to the government agencies even before allowances are made for appropriate discounts, such as litigation risks, the benefit derived from shelving the counterclaims, and the desirability of expediting the cleanup.[4] Accordingly, appellants' accountability challenge lacks force.

## C. *Fairness.*

■ In a somewhat related vein, appellants protest vehemently that Judge Woodlock evaded his obligation to make a finding on substantive fairness by failing to explain the settlements' allocation of responsibility either within or among the various classes of defendants. In support, appellants isolate a passage in *Cannons* in which we wrote:

> Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible. The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done.... Whatever formula or scheme EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs.

*Cannons*, 899 F.2d at 87 (citations omitted).

Appellants' error is to read *Cannons* without regard for its facts. Cases resolve particular controversies, and the standards they articulate often are framed in a certain way primarily to rebut an argument raised by a

---

4. For what it may be worth, the settlement compares quite favorably to the universe of CERCLA settlements, inasmuch as such settlements often compensate the public for only a tiny fraction of the overall expense. *See, e.g., In re Acushnet River*, 712 F.Supp. 1019, 1031–32 (D.Mass.1989) (approving settlement by primary owner/operator for $2,000,000 in contrast to projected total clean-up cost of $34,000,000); *City of New York v. Exxon Corp.*, 697 F.Supp. 677, 693–94 (S.D.N.Y.1988) (approving settlement by seven of fifteen defendants for less than $14,000,000 in contrast to projected total clean-up cost of $400,-000,000).

litigant. Thus, in *Cannons,* the quoted passage rebuffed a challenge to a particular method of allocation. It cannot be ripped root and branch from that context. In a passage conveniently overlooked by appellants, *Cannons* makes this very point; the court recognized that the standards it limned were not to be applied woodenly:

> [W]e are quick to concede that [fairness, reasonableness, and fidelity to the statute] are all mutable figures taking on different forms and shapes in different factual settings. Yet, the concepts' amorphous quality is no accident or quirk of fate. We believe that Congress intended, first, that the judiciary take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties; and second, that the district courts treat each case on its own merits, recognizing the wide range of potential problems and possible solutions.

*Id.* at 85–86.

In the circumstances of this case—a case that bears scant resemblance to *Cannons*—we do not believe that substantive fairness required a more detailed explanation of either the allocation or the allocation method. Three considerations pave the way to this conclusion.

*First:* There is little need for a court to police the substantive fairness of a settlement as among settling parties of a particular class. Sophisticated actors know how to protect their own interests, and they are well equipped to evaluate risks and rewards. A trial court can, therefore, usually confine its inquiry to the substantive fairness of the aggregate class contribution, or, put another way, to the proposed allocation of responsibility as between settling and non-settling PRPs. Here, the trial court performed this task in exemplary fashion. It would have served no useful purpose to go further and focus the lens of inquiry on the fairness of each class member's contribution.

*Second:* It is impossible to explain an allocation of liability in minute detail when, as now, the historical record is incomplete. And, though we hold district courts to high standards of excellence, we do not expect them to do the impossible. Thus, it is not surprising that most courts recognizing an obligation to make findings on comparative fault in the CERCLA context have framed the obligation in such a way as to afford an exception for cases in which reliable information is unavailable. *See id.* at 88 (explaining need for flexibility in weighing substantive fairness, particularly when the available information is "ambiguous, incomplete, or inscrutable"); *United States v. Bell Petroleum Serv.,* 21 Envtl.L.Rep. 20,374, ___, 1990 WL 310512, [1990 U.S.Dist. LEXIS 14066 at *8–*10] (W.D.Tex.1990) (rejecting the argument that, in order to deem a settlement fair, a court must find that a party's settlement corresponds to its fair share of liability, even when "no method of dividing the liability among the [d]efendants' exists that would not involve "pure speculation"); *Rohm & Haas,* 721 F.Supp. at 689 (stating that whether a settlement bears a reasonable relation to some plausible range of estimates of comparative fault is a determination that must be "based on the record"); *see also United States v. Conservation Chem. Co.,* 628 F.Supp. 391, 402 (W.D.Mo.1985) (declaring that a court should spurn a settlement which "arbitrarily or unreasonably ignores the comparative fault of the parties, *where there is a reasonable basis for allowing that comparison to be made*") (emphasis supplied).

Such an exception is vitally important because a muddled record is the norm in most CERCLA litigation. *See Cannons,* 899 F.2d at 88 (citing authority); *see also* Lynnette Boomgaarden & Charles Breer, *Surveying the Superfund Settlement Dilemma,* 27 Land & Water L.Rev. 83, 121 (1992) ("In most CERCLA actions, the government has difficulty accurately proving contribution amounts. Poor records, faulty memories, and a desire to escape liability all add to this difficulty."); Barry S. Neuman, *No Way Out? The Plight of the Superfund Nonsettlor,* 20 Envtl.L.Rep. 10,295, 10,299 (July 1990) ("In virtually all CERCLA cases, the recollections of waste haulers and site owner/operators are likely to be questionable, the documentation linking some generators to a specific site subject to attack, and the evidence generally incomplete.").

We conclude that so long as the basis for a sensible class-wide approximation is at hand—an approximation *"roughly* correlated with some acceptable measure of comparative fault," *Cannons,* 899 F.2d at 87 (emphasis supplied)—difficulties in achieving precise measurements of comparative fault will not preclude a trial court from entering a consent decree. On this understanding, we uphold the district court's division of responsibility between owner/operators, on one hand, and generators/transporters, on the other hand. On this record, splitting the responsibility between those two groups does not offend our sense of fairness.[5] *Cf., e.g.,* 2 Kings 3:16–18 (describing original Solomonic solution).

*Third:* As we wrote in *Cannons,* fairness is "mutable ..., taking on different forms and shapes in different factual settings," *id.* at 85. To that extent, fairness is an elusive concept. When substantive fairness cannot be measured directly, a court must devise alternate methods of testing for it.

Here, Judge Woodlock noted the lack of direct evidence of substantive fairness but ruled that such evidence was not essential because substantive fairness flowed as a natural consequence from procedural fairness. Then, after eliciting a concession from appellants' counsel that ample basis existed to allocate responsibility between different classes of defendants, the court proceeded to make a substantive fairness finding of limited reach, determining that the generators and transporters, collectively, were responsible for one-half of the overall damage.

We discern no error. Although appellants take umbrage at the idea that one type of fairness serves to assure the other, providing such an assurance is precisely the function of procedural fairness. *Cf., e.g.,* Sir Henry Maine, *Dissertations on Early Law and Custom* 389 (1886) ("Substantive law has ... the look of being gradually secreted in the interstices of procedure."). There exist many cases in which the data is so fragmentary that a district court cannot be held to the letter of the *Cannons* substantive fairness standard. In such cases, a finding of procedural fairness together with other circumstantial indicia of fairness, may constitute an acceptable proxy. *See* Neuman, *supra,* at 10,299 (postulating that incomplete records are so common in CERCLA litigation that, no matter how thorough a review the court undertakes, the search for substantive fairness typically collapses into a search for procedural fairness).

This is such a case. By all accounts, the conduct of the settlement negotiations, under the supervision of Chief Judge Tauro, was a textbook model—so much so that appellants do not press any objections to procedural fairness. We are thus reinforced in our conclusion that the lower court's fairness findings were both permissible and supportable.

### D. *The Scope of the Consent Decrees.*

Appellants' final set of arguments forces us to step outside the range of *Cannons.* Appellants claim that the consent decrees are overbroad both because they addressed claims that were not pleaded and because they addressed claims that had been sidetracked by the CMO.

**1. *The Standard.*** In its definitive statement concerning the scope of consent decrees, the Supreme Court explained that a court cannot lend its imprimatur to a settlement unless:

(1) it "spring[s] from and serve[s] to resolve a dispute within the court's subject matter jurisdiction"; (2) it 'come[s] within the general scope of the case made by the pleadings'; and (3) furthers the objectives upon which the complaint was based.

*Local No. 93, Int'l Ass'n of Firefighters v. Cleveland,* 478 U.S. 501, 525–26, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986); (citations omitted); *accord Conservation Law Found. v. Franklin,* 989 F.2d 54, 59 (1st Cir.1993). We apply this standard to the consent decrees at issue as a means of testing appellants' twin objections.

---

5. Appellants concentrate their fire on the first consent decree, and do not attack the substantive fairness of the allocation approved vis-a-vis the junior Georges. At any rate, that allocation, too, seems supportable.

**2. *Natural Resource Damages.*** Appellants' complain that the decrees resolved potential claims for damages to natural resources that were never pleaded and, accordingly, were not properly before the court. Even if we assume for the sake of argument that these claims would not have surfaced at a trial, appellants' objection is fruitless.

The objection calls into question only the second of the *Firefighters* requirements—and that requirement is satisfied in this instance. Indeed, the natural resource damage claims discussed in the decrees exemplify the type of related claims envisioned by the Justices as coming within the authority of an approving court. They are claims that, though not expressly set out in the pleadings, fall within their general scope.[6]

**3. *Claims Precluded Under the Case Management Order.*** Appellants' next complain that the consent decrees disposed of claims that could not have been litigated under the terms of the CMO, namely, potential claims by the plaintiffs against third-party defendants and potential claims anent trans-shipment issues. Insofar as we can tell, it is a question of first impression whether a consent decree may resolve claims that the parties were precluded from litigating under the court's own case management orders. On reflection, we believe that question must be answered affirmatively.

CMOs are designed to serve a variety of pragmatic objectives. These include not only expediting and focusing the litigation, *see* Fed.R.Civ.P. 16(a)(1)–(4), but also, as the current version of the rule recognizes, facilitating settlement, *see* Fed.R.Civ.P. 16(a)(5).[7] We think it follows that case management is an area in which the district court has "considerable discretion." *Geremia v. First Nat'l Bank,* 653 F.2d 1, 5 (1st Cir.1981). Although a CMO will ordinarily "control the subsequent course of the action," Fed. R.Civ.P. 16(e), it may be modified by subsequent order at the district court's pleasure, *see Ramirez Pomales v. Becton Dickinson & Co.,* 839 F.2d 1, 3 (1st Cir.1988), or, in the case of a final CMO, to prevent manifest injustice, *see* Fed.R.Civ.P. 16(e). More specifically, the trial court has very broad discretion to modify a preexisting case management order to facilitate settlements, at least in the absence of unfair prejudice. *See generally* 6A Charles A. Wright et al., *Federal Practice and Procedure* § 1525.1, at 253–54 (1990) (discussing district court's authority to encourage settlements). We see no unfair prejudice to appellants from the court's wise exercise of its discretion here.

Once we have reached this plateau, the rest flows naturally. It is evident from the very nature of case management orders that they are not jurisdictional in effect. Thus, the first *Firefighters* requirement is fulfilled. And as we explain below, the second and third *Firefighters* requirements also are met.

That the third-party and trans-shipment claims come within the general scope of the pleadings and advance the objectives of the plaintiffs' complaints cannot be gainsaid. CERCLA cost recovery actions are initiated in the hope of resolving all issues revolving around a particular Superfund site, and frequently, in the hope that resolution will take the form of a global settlement. This is consistent both with the statutory design and the common good. In the words of the district court:

> It would have been a foolish or odd consent decree that did not incorporate within it all of the potential claims that can and could have arisen out of th[is] litigation.... [I]t is altogether proper, indeed, in the larger public interest for [the court] to leave no loose threads.

at 687–88. The case at bar poses very different problems, bereft of jurisdictional overtones.

---

6. Appellants' contention to the contrary relies almost exclusively on the opinion in *City of New York v. Exxon Corp.,* 697 F.Supp. 677 (S.D.N.Y. 1988). But *Exxon* is easily distinguished. There, the district court refused to approve a settlement involving a non-party. *See id.* at 687. The court reasoned that it had no power to resolve a dispute outside its subject matter jurisdiction. *Id.*

7. We note that, in practice, these two sets of goals often go hand in hand. To hold settling parties to the strictures of a CMO, come what may, would place the two goals in tension with one another.

Moreover, the Supreme Court has made clear that there is no *per se* prohibition against consent decrees that exceed the possible bounds of a decision issued directly by the trial court. Because a consent decree is animated not only by the parties' legal claims but also by the parties' consent, a court is "not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial." *Firefighters,* 478 U.S. at 525, 106 S.Ct. at 3077. Viewed in this light, we do not think that the scope of the consent decrees exceeded the bounds of the trial court's discretion.

To recapitulate, then, a CERCLA consent decree may (and, in many cases, should) sweep more broadly than would the court's judgment in the event that the litigation culminated in a full-dress trial. Because this is true, and because the consent decrees pass *Firefighters* muster in all respects, we reject appellants' contention that the decrees are overbroad.

## IV. CONCLUSION

We need go no further. Finding, as we do, that appellants' asseverational array contains more cry than wool, we hold that the district court acted lawfully in approving the consent decrees at issue here.

*Affirmed.*