yFebruary 15, 1995UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1841

UNITED STATES OF AMERICA,
Plaintiff, Appellee,

v.

UGO DIBIASE, ETC., ET AL.,
Defendants, Appellants.

ERRATA SHEET ERRATA SHEET

The opinion of the Court issued on January 25, 1995, is
corrected as follows:

On cover sheet, line 6, change "Louis" to "Lois"

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1841

UNITED STATES OF AMERICA,
Plaintiff, Appellee,

v.

UGO DIBIASE, ETC., ET AL.,
Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Stahl, Circuit Judge.

Stephen M. Leonard, with whom Mintz, Levin, Cohn, Ferris,
Glovsky & Popeo was on brief, for appellants.
John E. Darling, with whom Joseph C. Correnti, Ellen M.
Winkler, and Serafini, Serafini and Darling were on brief, for
defendant-appellee South Essex Sewerage Dist.
Joan M. Pepin, with whom Lois J. Schiffer, Assistant
Attorney General, David C. Shilton, Catherine Adams Fiske, and
Andrea Nervi Ward Attorneys, U.S. Dept. of Justice, Environment &
Natural Resources Div., and John T. McNeil, Sr. Asst't Regional
Counsel, U.S. Environmental Protection Agency, were on brief, for
the United States.

January 25, 1995

SELYA, Circuit Judge. The United States negotiated a SELYA, Circuit Judge.

settlement with a potentially responsible party, the South Essex

Sewerage District (SESD), fixing SESD's share of certain

emergency removal costs incurred by the government in the cleanup

of a Superfund site.1 The district court placed its imprimatur

on the settlement by entering a consent decree (the SESD decree).

Appellant, Ugo DiBiase, a non-settling responsible party left to

hold the bag for the remainder of the emergency removal costs,

prosecuted this appeal in hopes of convincing us that the consent

decree is unfair. We are not persuaded.

I. BACKGROUND I. BACKGROUND

The Salem Acres Superfund Site (the Site) consists of

five acres of undeveloped land containing wetlands and a brook,

located in Salem, Massachusetts. From 1946 until 1969, James

Grasso owned it. During that interval, Grasso permitted SESD to

dump at the Site. SESD deposited sewerage wastes into unlined

"sludge pits" which were surrounded by earthen berms and fences.

SESD maintained the Site, including the berms and interior

fencing, during the period that Grasso permitted it to dump

there.

In December of 1969, Grasso sold a large tract of land

that encompassed the Site to Salem Acres, Inc., a corporation



1At that point in time, the emergency removal costs totalled
$2,258,893. They comprised sums already spent by the United
States for containment and capping work at the Site, together
with interest and costs of enforcement. See 42 U.S.C. 9604,
9607.

3

owned jointly by two brothers, Ugo and Elio DiBiase.2 Unaware

that the property had changed hands, SESD transported a shipment

of solid wastes to the sludge pits early in 1970. When appellant

learned of this occurrence, he informed SESD that he would not

tolerate disposal at the Site in the future. SESD refrained from

further dumping.

During the 1970s, appellant received correspondence

from various municipal agencies, including the Board of Health

and the Fire Department, expressing concern over the unrestricted

access to the Site and the random dumping that was taking place.

Appellant responded by erecting gates at the entrances to the

property, but he did not thereafter maintain them. Consequently,

intermittent dumping by unknown parties continued.

Appellant claims that he had no direct knowledge of the

sludge pits until 1980, when a state agency notified him that

legal action would be taken unless he rectified conditions at the

Site. Even when confronted with this threat, appellant failed to

take meaningful action. He agreed to install new gates, but, in

the end, neglected to do so. And although the earthen berms and

interior fencing around the sludge pits had completely decayed,



2In 1982, Elio DiBiase divested himself of any beneficial
interest in the property, and the corporation transferred title
to the Site to DiBiase Salem Realty Trust, an entity under
appellant's sole control. Hence, the defendants in the
underlying action include DiBiase Salem Realty Trust; Ugo
DiBiase, in his capacity as trustee; and Ugo DiBiase,
individually. For ease in reference, we ignore both Elio's
passing involvement and the inclusion of the trust as a
defendant, and treat Ugo DiBiase as the property owner and sole
appellant.

4

appellant made no discernible effort to investigate the situation

or ameliorate the obvious hazards (or so the district court

supportably found).

In 1987, an easily foreseeable contretemps occurred.

Heavy rains caused the sludge pits to overflow and release

deleterious substances into the nearby wetlands (including the

brook). The United States Environmental Protection Agency (EPA)

reacted to the release by conducting the two emergency removal

actions that underlie this appeal. After completing that work,

the government sued appellant and SESD, seeking not only to

recover EPA's emergency removal costs but also to secure a

declaration of the defendants' liability for future cleanup

costs.

In due season, the district court granted the

government's motion for partial summary judgment against

appellant, finding him liable for past and future response costs

at the Site under the Comprehensive Environmental Response,

Compensation, & Liability Act (CERCLA), 42 U.S.C. 9601-9675.

The government lodged a similar motion against SESD, but the

district court never ruled on it. Thus, at the time it signed

the consent decree, SESD remained a potentially responsible party

(PRP) rather than a demonstrably responsible party (like DiBiase)

whose liability had been judicially established.

Throughout the proceedings, the government endeavored

to arrange a global settlement. Though EPA's negotiations with

appellant came to naught, its negotiations with SESD bore fruit.

5

After notice, opportunity for public comment, and an in-court

hearing, the district court, over appellant's vigorous objection,

entered the SESD decree on April 5, 1994. Under it, SESD agreed,

inter alia, to reimburse the United States for 85% of the past

removal costs calculated as of the settlement date. SESD's

payment amounted to $1,822,775.

On May 6, 1994, the district court entered judgment

against appellant for $494,207, representing the unremunerated

portion of the government's historic removal costs calculated as

of that date.3 After the court denied DiBiase's motion for

reconsideration, this appeal ensued.

II. STANDARD OF REVIEW II. STANDARD OF REVIEW

The legislative history of the Superfund Amendments and

Reauthorization Act of 1986 (SARA), P.L. 99-499, 101 et seq.,

clearly indicates that, when reviewing a proposed consent decree

in the CERCLA context, a trial court does not write on a pristine

page. Instead, its function is circumscribed: it must ponder

the proposal only to the extent needed to "`satisfy itself that

the settlement is reasonable, fair, and consistent with the

purposes that CERCLA is intended to serve.'" United States v.

Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir. 1991) (quoting

House Report).

This circumscription has important ramifications for

appellate oversight. We elucidated the standard of review


3The amount also includes incremental interest and
enforcement costs arising after the effective date of the
settlement between SESD and the United States. See supra note 1.

6

governing the entry of CERCLA consent decrees in Cannons, and

reaffirmed that standard in United States v. Charles George

Trucking, Inc., 34 F.3d 1081 (1st Cir. 1994). We noted that, by

the time CERCLA consent decrees reach this court,

they are "encased in a double layer of
swaddling." In the first place, a trial
court, without abdicating its responsibility
to exercise independent judgment, must defer
heavily to the parties' agreement and the
EPA's expertise . . . . The second basis
for deference is equally compelling. Because
an appellate court ordinarily cannot rival a
district court's mastery of a factually
complex case . . . the district court's views
must be accorded considerable respect.

Largely in consequence of these layers
of protective swaddling, an appellate
tribunal may overturn a district court's
decision to approve or reject the entry of a
CERCLA consent decree only for manifest abuse
of discretion. [In other words], the
decision below stands unless the objectors
can show that, in buying into [the decree],
the lower court made a serious error of law
or suffered a meaningful lapse of judgment.

Id. at 1085 (quoting and citing Cannons, 899 F.2d at 84). It is

this yardstick which must be used to measure the lower court's

acceptance of the SESD decree.

III. DISCUSSION III. DISCUSSION

On appeal, DiBiase does not attack the district court's

liability determination. Rather, he fires a rifle shot aimed

strictly and solely at the appropriateness of the court's

allocation of the emergency removal costs. The shot misses the

mark.

In actuality, appellant draws a bead on an even tinier

target. He virtually concedes that two of the three criteria for

7

the approval of an environmental consent decree have been

satisfied, and snipes only at the fairness vel non of the SESD

decree. Moreover, while fairness in respect to CERCLA

settlements has both a procedural and a substantive aspect, see

Cannons, 899 F.2d at 86, appellant does not train his sights on

any alleged procedural unfairness. Since our inquiry must be

limited accordingly, the issue before us reduces to whether the

SESD decree, as approved below, is substantively fair.

Substantive fairness has a protean quality and,

therefore, is often discussed in general terms. In Cannons, we

wrote:

Substantive fairness introduces into the
equation concepts of corrective justice and
accountability: a party should bear the cost
of the harm for which it is legally
responsible. The logic behind these concepts
dictates that settlement terms must be based
upon, and roughly correlated with, some
acceptable measure of comparative fault,
apportioning liability among settling parties
according to rational (if necessarily
imprecise) estimates of how much harm each
PRP has done . . . .

Whatever formula or scheme EPA
advances for measuring comparative fault and
allocating liability should be upheld so long
as the agency supplies a plausible
explanation for it, welding some reasonable
linkage between the factors it includes in
its formula or scheme and the proportionate
shares of settling PRPs.

Id. at 87 (citations omitted). Viewing the SESD decree in this

deferential perspective, we find EPA's rationale for the proposed

allocation to be plausible, and also find the district court's

endorsement of that rationale to be well within the parameters of

8

fundamental fairness.

In the first instance, the allocation reflects EPA's

determination that both SESD and DiBiase are legally responsible

to reimburse the public fisc for the emergency removal costs. It

is impossible to quarrel with this determination. SESD, though

not adjudged liable, no longer contests its liability. By like

token, DiBiase has not appealed the district court order

adjudging him liable for the damages; and, legally, the liability

of responsible parties in a CERCLA case is joint and several, see

O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989), cert.

denied, 493 U.S. 1071 (1990).

Next, the allocation fashioned by EPA reflects the

agency's assessment that SESD, as the generator and transporter

of most of the toxic waste dumped in the sludge pits, is chiefly

responsible for the offending conditions. The consent decree

recognizes this primary responsibility by assigning the lion's

share of the removal costs to SESD. The flip side of the same

coin is that the consent decree implicitly recognizes appellant's

lesser involvement by leaving a relatively small share of the

removal costs (15%) to be collected from him.

The district court concluded that this apportionment is

fair. The court cited its earlier judgment on liability, noted

appellant's utter failure to take any action either to

investigate conditions or to ameliorate danger during almost two

decades of involvement in Site ownership and more than seven

years of actual knowledge about the sludge pits, and specifically

9

rejected appellant's claim that he "did no wrong." Appellant

importunes us to set aside the district court's order. Despite

having been adjudged liable, appellant stubbornly refuses to

recognize his own culpability and maintains that it is unfair to

expect him to bear any of the removal costs. His importuning

fails for no fewer than five reasons.

In the first place, appellant does not cite and we

have been unable to locate any CERCLA case in which a

demonstrably liable party has been held entitled to safe passage

in a global settlement. We think it is counterintuitive to

suppose that any such entitlement exists.

Second, and relatedly, we regard appellant's argument

as a surreptitious attempt to relitigate his "innocent landowner"

defense, see 42 U.S.C. 9607(b)(3) (exonerating PRPs who

"exercised due care" and can demonstrate, inter alia, that a

release was caused "solely" by a third party's act or omission);

see also Westwood Pharmaceuticals, Inc. v. National Fuel Gas

Distrib'n Corp., 964 F.2d 85, 89-91 (2d Cir. 1992) (discussing

operation of innocent landowner defense),4 rejected by the



4For purposes of this statutory provision, a PRP is
responsible for the acts and omissions of his employees, agents,
or other persons who have a "contractual relationship" with him.
42 U.S.C. 9607(b)(3). The term "contractual relationship"
includes relationships involving "land contracts, deeds, or other
instruments transferring title," 42 U.S.C. 9601(35), subject to
certain exceptions. One such exception is for innocent
landowners, that is, acquirers of land who, having made "all
appropriate inquiry" into the condition of the property at the
time of acquisition, id. 9601(35)(B), nevertheless "had no
reason to know" that any environmental problem might exist, id. 
9601(35)(A).

10

district court when it granted the government's motion for

partial summary judgment. We have no warrant to entertain a

collateral attack on that judgment. It follows that, as a party

jointly and severally liable for payment of all the emergency

removal costs, appellant cannot reasonably expect others to foot

the entire bill.

In the third place, the allocation proposed by EPA and

ratified by Judge Mazzone does not strike us as either

substantially disproportionate or manifestly unfair. To be sure,

SESD played a leading role in the contamination of the Site and

appellant, who came on the scene later, played an appreciably

less prominent role. But, an actor cast in a bit part is not to

be confused with a mere spectator, whose only involvement is to

lounge in the audience and watch events unfold. Appellant

contributed to the 1987 incident in a variety of ways. Despite

being warned of a potentially dangerous condition, he twiddled

his thumbs: he failed to safeguard the Site, thus permitting

third parties to dump at will and exacerbate an already parlous

situation; fiddled while the earthen berms deteriorated; and

turned a blind eye to evolving public health and safety concerns.

Allocating 15% of the historic removal costs as appellant's share

seems commensurate with these shortcomings and with the quantum

of comparative fault fairly ascribable to him.

Fourth, appellant's concept which seems to be that

liable parties should go scot free in environmental cases if

other parties are considerably more culpable runs at cross-

11

purposes with CERCLA's policy of encouraging settlements as

opposed to endless court battles. See H.R. Rep. No. 253, 99th

Cong., 1st Sess., pt. 5, at 58-59 (1985), reprinted in 1986

U.S.C.C.A.N. 3124, 3181-82; see also United Technologies Corp. v.

Browning-Ferris Indus., Inc., 33 F.3d 96, 102-03 (1st Cir. 1994)

(explaining the interface between settlement and liability).

Such settlements reduce excessive litigation expenses and

transaction costs, thereby preserving scarce resources for

CERCLA's real goal: the expeditious cleanup of hazardous waste

sites.

In most instances, settlement requires compromise.

Thus, it makes sense for the government, when negotiating, to

give a PRP a discount on its maximum potential liability as an

incentive to settle. Indeed, the statutory scheme contemplates

that those who are slow to settle ought to bear the risk of

paying more if they are eventually found liable. See 42 U.S.C. 

9613(f)(2) - (3); see also Cannons, 899 F.2d at 91-92. Congress

apparently thought that paradigm fair, and so do we.

This case illustrates the point. The government gave

SESD a 15% discount on its maximum potential exposure. This

proved to be a sufficient incentive to achieve a settlement,

despite the fact that SESD's liability had not yet been

adjudicated. Appellant who, unlike SESD, already had been

found liable received ample opportunities to buy peace, but

took no advantage of them. Against this unsympathetic backdrop,

appellant cannot rewardingly complain that he must now shoulder a

12

larger share of the overall expense than might have been the case

if he had moved faster or if SESD had proven intransigent.

Fifth, and last, fairness rarely can be described in

absolute terms. There is no litmus test for it and no one

allocation that will, in a CERCLA case, comprise the only fair

allocation. Rather, fairness is a mutable construct that

"tak[es] on different forms and shapes in different factual

settings." Cannons, 899 F.2d at 85. Absent a mistake of law 

and we see none here this reality, coupled with the twice-

insulated deference afforded CERCLA consent decrees, see Charles

George Trucking, 34 F.3d at 1085; Cannons, 899 F.2d at 84, places

a heavy burden on an objector who strives to convince an

appellate court that error inheres in the entry of such a

decree.5 In this case, the burden has not been carried. Judge

Mazzone's finding that the SESD decree falls within the wide

universe of fair solutions is abundantly supported.

IV. CONCLUSION IV. CONCLUSION

We need go no further.6 Because appellant has neither



5This burden is particularly weighty when the district judge
is called upon to assess the comparative fault of different
classes of PRPs. So it is here. The court below had to contrast
the fault ascribable to a generator and transporter (SESD) with
the fault ascribable to a landowner (DiBiase). In such
circumstances, the trial judge is in effect forced to compare
apples with oranges. Accordingly, his prolonged exposure to the
litigation and his firsthand knowledge of the case's nuances
become extremely important, heightening the need for deference.

6This appeal presents no issues anent cleanup costs over and
above the emergency removal costs. The parties informed us at
oral argument that all issues of that nature have been resolved
amicably.

13

offered any compelling reason to brand the consent decree unfair

nor persuaded us that the district court blundered in approving

it, his appeal falters.

Affirmed. Affirmed.

14