934 F.Supp. 324 (1996)
UNITED STATES of America, Plaintiff,
v.
UNION ELECTRIC COMPANY, et al., Defendants.
STATE OF MISSOURI, et al., Plaintiffs,
v.
UNION ELECTRIC COMPANY, et al., Defendants.
Nos. 1:92CV00078 GFG, 1:92CV00088 GFG.
United States District Court, E.D. Missouri, Southeastern Division.
August 14, 1996.
*325 *326 Madeleine B. Cole, Office of U.S. Attorney, St. Louis, MO, Barry M. Hartman, Elizabeth L. Loeb, Steven Novick, Michael McNulty, U.S. Dept. of Justice, Washington, DC, Sarah Toevs-Sullivan, U.S. E.P.A., Region VII, Kansas City, MO, Amy Svoboda, U.S. E.P.A., Office of Enforcement, Washington, DC, for plaintiff U.S.
John F. Cowling, George M. Von Stamwitz, Armstrong and Teasdale, St. Louis, MO, Alphonse McMahon, GE Plastics, Mt. Vernon, IN, for defendant Union Electric Company.
Alphonse McMahon, GE Plastics, Mt. Vernon, IN, for all other defendants.

ORDER AND MEMORANDUM
GUNN, District Judge.
This matter is before the Court on the federal government's Motion to Re-enter Consent Decree.
This action was brought by the United States pursuant to sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. §§ 9606, 9607. The government seeks approval of a consent decree lodged with this Court. The Consent Decree requires certain potentially responsible parties ("PRPs") to pay some of the costs associated with cleaning up the Missouri Electrical Works Site ("MEW Site") in Cape Girardeau, Missouri.
Pursuant to the mandate of the Eighth Circuit, the Court granted the Motion to Intervene of various parties (the "Intervenors") on November 29, 1995. United States v. Union Elec. Co., 64 F.3d 1152 (8th Cir. 1995). The Intervenors are non-settling PRPs, and they contest court approval of the consent decree. In an Order dated April 11, 1996 the Court found that an evidentiary hearing was not necessary.

I. Background
In June of 1992, the United States filed suit against 179 PRPs for injunctive relief and the recovery of costs for the cleanup of the MEW Site. The State of Missouri filed an identical suit less than one month later against the same PRPs. The two cases were consolidated and the Consent Decree was lodged with the Court.
The MEW Site was owned at all relevant times by Missouri Electrical Works, Inc. ("MEW"), an electrical equipment sale and repair shop located near Cape Girardeau, Missouri. Since 1953, MEW has repaired or scrapped more than 16,000 transformers at the MEW Site. The total amount of transformer oil that was not recycled during *327 MEW's operation is estimated at 28,000 gallons. Apparently, solvents, hazardous chemicals, and electrical equipment, including thousands of transformers containing oil contaminated with polychlorinated biphenyl ("PCB"), were disposed of at the MEW Site adjacent to the shop.
The Environmental Protection Agency ("EPA") began to investigate the MEW Site in the mid-1980s. EPA found that the soil at the MEW Site is contaminated with PCBs, specifically Aroclor 1260. It also determined that there is some groundwater contamination; however, later studies contradicted that finding and the current status of groundwater contamination, if any, is uncertain.
In 1988, EPA and a group of PRPs formed the Missouri Electric Works Steering Committee ("MEWSC") through an Administrative Order on Consent. MEWSC was to conduct a remedial investigation and feasibility study at the MEW Site.
From 1988-91, EPA sent general notices to all PRPs and special notice letters inviting PRPs to participate in settlement negotiations. MEWSC as well sent letters inviting participation and keeping all PRPs informed of its activities. The negotiations involving the federal government, the State of Missouri, and MEWSC resulted in the Consent Decree. EPA sent a copy of the decree to all PRPs and invited their participation. PRPs were given an opportunity for final objections to the ultimate settlement package.
The Intervenors are service shop owners and their trade association. The Intervenors either sold transformers directly to MEW for resale, sold transformers to third parties who resold them to MEW, or sent transformers owned by others to MEW for repair. The Intervenors object to the entry of the Consent Decree.

II. Provisions of the Consent Decree
The Consent Decree generally requires that, subject to oversight by EPA, the settling PRPs (1) design and implement specific remedial action for the soil contamination and operate and maintain the MEW Site consistent with such action; (2) perform a groundwater design investigation; and (3) reimburse certain future and past response costs incurred by the government. (Consent Decree, Exh. A at 13-14, 16-18, 20-25, 29-30, 52-54.)
The settling defendants agree to establish and maintain financial security in the amount of $17.6 million and a trust fund to assure completion of the work. Id. at 42, 44. Settling defendants must pay for all costs but will be reimbursed by the government for 20% of some costs incurred in the design and construction of the remedial action, the groundwater design investigation and additional response actions conducted necessary to achieve certain performance standards. Id. at 46. Additionally, special provisions in the Consent Decree apply to the cashout payments of settling federal agencies and various de minimis settling defendants. Id. at 85-86, 91, 101. The de minimis settling defendants each contributed less than fourtenths of one percent (0.4%) of the hazardous substances to the Site. Id. at 5.
MEWSC developed a cost Allocation Formula to determine the liability of all parties to the settlement. Id. App.K. Basically, the Formula makes liability volumetrically proportional to the amount of oil contained in types of electrical equipment at the MEW Site. Id. App. K at 2. An individual PRP's share of the liability is dependent upon that PRP's relationship to the various equipment at the Site. Id.

III. Entry of the Consent Decree
Before entering a consent decree, this Court must find that the settlement is procedurally fair, substantively fair, reasonable, and consistent with CERCLA. United States v. Hercules, 961 F.2d 796, 800 (8th Cir.1992); United States v. Cannons Eng'g Corp., 899 F.2d 79, 84-86 (1st Cir.1990); Arizona v. Nucor Corp., 825 F.Supp. 1452, 1456 (D.Ariz.1992), aff'd sub nomine, Arizona v. Components, Inc., 66 F.3d 213 (9th Cir.1995).

A. Procedural Fairness
"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gage its candor, openness, and bargaining balance." Cannons, 899 F.2d at 86. The Intervenors complain that EPA refused to negotiate with *328 them separately and that MEWSC was controlled by PRPs who believed in spreading liability among as many parties as possible. The PRPS in charge of MEWSC, according to the Intervenors, were only interested in decreasing their own liability. The Intervenors assert that their interests were not represented by MEWSC and that they were effectively denied access to the group's discussions and negotiations due to high participation fees. They further contend that their involvement as nonmembers of MEWSC was meaningless.
The initial assessment to cover MEWSC's expenses was $200 per member; however, the initial assessment was $2,500 for PRPs who had equipment at the site with a total rating of over 90 kilovoltampere. The two tier assessment system was designed to minimize the impact on di minimis members. Under the Group Agreement which every member signed, those paying the higher assessment are given more voting power than the di minimis members. Members were required to pay the assessment or face exclusion from MEWSC. The Group Agreement also provides that members whose interest or actions were regarded as contrary to the interests of the group could be removed by a vote of two-thirds of the group's voting power.
The Court has reviewed the Group Agreement and minutes from the many MEWSC meetings. The Court finds that there was no unfairness in MEWSC's management and operation. The Intervenors had ample opportunity to participate in the negotiations which lasted for several years. The membership fees were not unreasonable, and MEWSC made an effort to keep the nonmembers informed of the group's activities and invited them to attend many of the group's meetings. The Intervenors remained informed about MEWSC's activities throughout its negotiations with the EPA.
There is nothing inherently unfair about EPA's choosing to negotiate and settle with MEWSC. Under CERCLA, EPA is "at liberty to negotiate and settle with whomever it chooses." Bliss, 133 F.R.D. at 569 (citing Cannons, 899 F.2d at 93.) "EPA's practice of negotiating with a representative group of PRPs, then having them resolve the details of the settlement among themselves, is a practical and reasonable process for achieving settlements." United States v. Acton Corp., 733 F.Supp. 869, 873 (D.N.J.1990). See also United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1086 (1st.Cir.1994).
Furthermore, in this case, EPA was not unwilling to negotiate with the Intervenors separately. EPA invited the Intervenors to make a settlement offer; the Intervenors declined. EPA and the Intervenors exchanged letters on numerous occasions regarding the possibility of separate settlement and on the Intervenors' claims of nonliability for many transactions with MEW. The Intervenors were not ignored. EPA also expressed a willingness to review MEWSC's proposed allocations. Some PRPs were able to convince the EPA to reduce their allocations. Again, "what the Intervenors do not appreciate is that a failure of all parties to reach an agreement with the government is not necessarily indicative of procedural unfairness." United States v. Union Elec. Co., 863 F.Supp. 1001, 1006 (E.D.Mo.1994).
The record in this case demonstrates that the EPA and MEWSC attempted an open and candid dialogue among all PRPs and that the procedures employed in creating the Consent Decree were fair.

B. Substantive Fairness
"Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." Cannons, 899 F.2d at 87. Liability should be apportioned among settling PRPs "according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." Id. The court must approve of the method proposed by the government unless it is "arbitrary, capricious, and devoid of a rational basis." Id.
The Intervenors argue that the Allocation Formula is arbitrary and capricious because it allocates liability volumetrically by oil rather than by concentration of PCBs in the oil. They emphasize that this reduces the liability *329 of those responsible for sending high concentrations of PCB-contaminated oil to the MEW Site. They charge that the Formula unfairly presumes that all transformers sent to the site contained PCBs. The Intervenors explain that just because a transformer contains oil does not mean that it contains PCBs. There are different kinds of transformers. Some use PCB-free mineral oil, and some of the PCB-oil using transformers are filled with askarel, an oil with high concentrations of PCB.
MEWSC drafted the Allocation Formula. EPA reviewed and recommended the Allocation Formula after assessing all of the background data upon which it was based, including MEW records, MEWSC records, Site conditions, Site remedy, PCB regulations, and industry practices. Also, MEWSC's Allocation Committee made detailed findings, after inviting comments and participation of all PRPs, justifying the appropriateness of the Allocation Formula.
The task of the Allocation Committee was to determine how liability for the PCB contamination should be apportioned. The Committee decided to focus on the contamination attributable to oil only because it deemed MEW solely responsible for contamination from the solvents. MEW kept three types of records: (1) a ledger, consisting of approximately 12,500 records covering 1952-1988; (2) purchased transformer cards, consisting of approximately 8,000 records covering 1954-1987; and (3) serviced transformer cards, consisting of approximately 4,500 records covering 1971-1988. However, the MEW records generally contain no information regarding the PCB concentrations. MEWSC gathered as much information as possible from its members, MEW, and the government and developed a database of the available information. The notes of the Allocation Committee's meetings reveal that the Committee wrestled with whether MEWSC had the information and evidence to support an allocation formula based on PCB concentrations. The Committee concluded that it lacked reliable evidence on PCB concentrations, a conclusion supported by the record.
Certain transformers were designed to use mineral oil, not contaminated with PCBs, and other transformers were designed to use PCB-contaminated oil. However, mineral transformers can be PCB-contaminated if the equipment used to fill the transformer was tainted with traces of PCBs. In addition, as a common industry practice, mineral and PCB-contaminated oils were mixed for use.
The Allocation Formula applies unless the PRP can show that the transformer could not possibly have contained PCBs (less than 2 parts per million). Initially, the Intervenors complain that this unfairly shifts the burden of proof to the PRPs when it should be on the government. The fact that a PRP carries the burden in the settlement to show that it is entitled to pay less is not inherently unfair. The PRP, after all, derives a substantial benefit from settling a case early to avoid litigation costs. Furthermore, in this case, the PRPs have access to all the government's information and evidence; however, other evidence of a PRP's responsibility lies with the PRP and its records.
The Intervenors also argue that 2 ppm is not a reasonable remedial goal and that 10 ppm should have been used. However, under CERCLA regulations PCBs are a hazardous substance regardless of their levels. 40 C.F.R. § 302.4 (Table 302.4). Moreover, because PCBs adhere to the soil, the lower levels of PCB-contaminated oil may contribute significantly to soil contamination and justify the remedial requirement of 2 ppm.
The Allocation Formula also makes an accommodation for equipment that had been drained of oil prior to shipment to the Site by assessing costs based on only 10% of the volume of oil. The 10% assessment accounts for residual oil left in the equipment after drainage. While EPA had evidence that a properly drained transformer retained 5% of its oil in the cores and coils, it also had information that the cores and coils removed from drained units and stored at the MEW Site presented a direct means of PCB contamination. Therefore, the 10% assessment represents a compromise of these concerns.
The Court is persuaded that the Allocation Formula is not arbitrary and capricious. The fact that liability is based on volume rather than toxicity is not unfair given *330 the evidentiary problems which plague this case. Cannons, 899 F.2d at 88. "Difficulties in achieving precise measurements of comparative fault will not preclude a trial court from entering a consent decree." Charles George Trucking, 34 F.3d at 1089. Reliable information is typically not available in CERCLA cases: "[A] muddled record is the norm in most CERCLA litigation." Id. at 1088. This is not surprising given that CERCLA was enacted relatively recently in 1980 and applies retroactively to conduct occurring decades before environmental regulation. United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726, 732 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).
The Intervenors also attack as arbitrary and capricious the inclusion of certain types of transactions. They say that MEW records reveal that MEW was involved in three types of transaction with PRPs: (1) repairing transformers; (2) buying and reselling transformers; and (3) buying transformers for scrap. CERCLA makes liable "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... from which there is a release, or a threatened release ... of a hazardous substance" for removal and remedial costs incurred as a result of the release. 42 U.S.C. § 9607(a)(3) (emphasis added). The intervenors contend that only the third situation listed above would trigger "arranger" liability and that those PRPs who sent transformers to MEW for repair or sold used transformers to MEW for resale should not be liable under CERCLA. The Intervenors state that they would have joined in the settlement if there was a factor in the Allocation Formula to take into account the nature of the transactions.
The Court does not agree that CERCLA per se excludes the sale of used but useful goods from its liability net. Sale of a useful product that contains a hazardous substance does not necessarily trigger CERCLA liability if that substance later leaks into the environment. See, e.g., Florida Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313 (11th Cir.1990). However, the intent of the parties to the transaction is not controlling. Aceto, 872 F.2d at 1380. A person may purport to sell a used but still useful product, but, if the buyer purchases the product to scrap it, then the seller may nevertheless be liable under CERCLA. United States v. Summit Equip. & Supplies, Inc., 805 F.Supp. 1422, 1432 (N.D.Ohio 1992). Furthermore, the Allocation Formula fairly divides responsibility for the used transformers between the seller, MEW, and any brokers or joint venturers involved.
Similarly, the Court is not persuaded that a party sending a transformer to MEW for repair would be per se free from CERCLA liability. CERCLA is a strict liability statute, and the Eighth Circuit has mandated that courts "look beyond [PRPs'] characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous waste." United States v. Aceto Agric. Chem. Corp., 872 F.2d 1373, 1377, 1380 (8th Cir.1989). But see, Amcast Indus. Corp. v. Detrex Corp., 2 F.3d 746, 751 (7th Cir.1993). Many of the transformers sent to MEW for repair presumably contained PCB-contaminated oil. The Intervenors contend that if oil was removed during repairs, the transformer would be refilled with the removed oil. Therefore, PCB-contaminated oil would not have been released at the Site through MEW's repair work.
The record reflects that the government discovered that this is not always the practice. Many times removed oil is discarded before repairs are made, and the repaired transformer is filled with new PCB-contaminated oil. Also, the government and MEWSC learned that PCB-contaminated oil can taint the equipment used to drain and refill oil from transformers. The removed oil might be mixed with contaminated oil and stored in leaking containers for later use in repaired units. In addition, leaking transformers would be placed on the property while awaiting repair. In such situations, the party's contract for the repair of a transformer may encompass an "arrangement" for the disposal of the PCB-contaminated oil in the unit.
*331 Furthermore, the government argues that while MEW records were helpful for identification of PRPs, they do not contain reliable information regarding what happened to the various transformers. MEW records fail to document the condition of equipment upon arrival, the nature of work performed, and the deterioration of units stored. Based on a review of the record, the Court concludes that the same evidentiary difficulties regarding PCB concentrations exist regarding the nature of PRPs' transactions with MEW.
Finally, the Intervenors maintain that the settling PRPs are paying less than their fair shares. The Court notes that:
Our task is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of liability appropriately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolutions.
United States v. Rohm & Haas Co., 721 F.Supp. 666, 679-81 (D.N.J.1989). See also United States v. Montrose Chem. Corp. of California, 50 F.3d 741, 747 (9th Cir.1995); Charles George Trucking, 34 F.3d at 1087. In this case, the Consent Decree requires the settling PRPs to pay collectively at least 80% of the costs associated with the soil remedy and the groundwater investigation. The Allocation Formula attributes 65% of responsibility for the environmental contamination to those settling. Discounted for litigation costs and time savings, these numbers comparatively represent a fair settlement, especially in light of evidentiary difficulties.
The Intervenors' overriding concern in this case is that the Allocation Formula attributes them with liability. The Intervenors' position is that they are not liable under CERCLA. Entry of the Consent Decree will sever the Intervenors' contribution rights against the settling PRPS; however, it will not prevent them in any way from arguing in subsequent litigation that they are not liable. They will not be bound by the Allocation Formula.
The Court finds that the Consent Decree represents a substantively fair settlement.

C. Reasonableness
Whether a consent decree is reasonable involves consideration of "the technical adequacy of the remedies proposed and the adequacy of the settling defendants' obligations to cover the response costs, particularly weighed against the savings represented by settlement over litigation." Bliss, 133 F.R.D. at 568 (citing Cannons, 899 F.2d at 90). The Court need not assess whether the government made the best possible settlement. Nucor, 825 F.Supp. at 1464. The "underlying purpose of the court in making these inquiries is to determine whether the decree adequately protects the public interest." United States v. Seymour Recycling Corp., 554 F.Supp. 1334, 1339 (S.D.Ind.1982).
The Intervenors do not challenge the efficacy of the remedial action selected for the MEW Site. Under the terms of the Consent Decree, the settling PRPs will treat the soil contamination with onsite incineration. (Consent Decree App. B at 2, App. A at 29, 37.) Additionally, they will conduct a groundwater investigation to determine if any remedial action is necessary. (Consent Decree App. B at 19.) The settling PRPs will pay approximately 80% of the costs associated with these activities and will post a bond to assure completion of the work as described above. The remedial action will begin immediately with the entry of the Consent Decree.
Upon careful consideration of the record in this case, the Consent Decree, and the Intervenors' objections, the Court is satisfied that the settlement reached in this case is reasonable and serves the public interest.

D. Consistency with CERCLA
Finally, the settlement must be consistent with CERCLA's "overarching principles: accountability, the desirability of an unsullied environment, and promptness of response activities." Cannons, 899 F.2d at 90. CERCLA favors settlement over litigation. Id. at 92. Under the terms of the Consent Decree, contaminated soil at the *332 MEW Site will be cleaned and the extent of any groundwater contamination determined. Those largely responsible will ensure the completion of that work. The work will be performed promptly and will save the government and the public further expense and delay. Clearly, entry of the Consent Decree is faithful to the objectives and design of CERCLA.
In light of the foregoing, the Court will grant the government's Motion to Re-enter the Consent Decree. Accordingly,
IT IS HEREBY ORDERED that plaintiff's Motion to Re-enter the Consent Decree (Doc. No. 53) is granted.
IT IS FURTHER ORDERED that any other pending motions are denied as moot.