**UNITED STATES, Plaintiff,**

v.

**ACTON CORP., et al., Defendants.**

**Civ. No. 89–3652 (GEB).**

United States District Court,
D. New Jersey.

March 28, 1990.

Donald G. Frankel, Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Michael A. Brown, Schmeltzer, Aptaker & Sheppard, P.C., Washington, D.C., for settling defendants.

Joan W. Appleyard, Mehr & La France, Freehold, N.J., for intervenor Freehold Cartage, Inc.

Robert A. Matthews, Mc Kenna, Connor & Cuneo, Washington, D.C., for intervenors.

## OPINION

GARRETT E. BROWN, Jr., District Judge.

On March 5, 1990, this matter was before the Court on the United States' motion for

entry of a consent decree pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* The consent decree settles claims by the United States Environmental Protection Agency ("EPA") against the 116 *Acton* defendants ("the settling defendants") arising out of the cleanup of the Lone Pine Landfill in Freehold Township, New Jersey. EPA and the settling defendants submitted separate briefs in support of the motion. The motion was opposed by seventeen defendants in a related action before this Court, *United States v. Armstrong World Indus., et al.*, Civ. No. 89–4363(GEB), who had intervened in this action for the purpose of opposing the consent decree ("the Intervenors"). Sixteen of the Intervenors are companies who are responsible for a portion of the waste at the Lone Pine Landfill. The seventeenth Intervenor is a waste disposal company, Freehold Cartage, Inc., which allegedly transported approximately 21% of the waste to the site. At the conclusion of oral argument, the Court approved the consent decree from the bench for the reasons stated herein.

BACKGROUND

The Lone Pine Landfill site is an inactive landfill of approximately 63 acres, 45 of which were used for landfill operations. The Lone Pine Corporation owned and operated the landfill from 1959 to 1979. Until the late 1970's, the site contained a wide variety of municipal, commercial, and industrial wastes. Throughout 1977 and 1978, however, the landfill began receiving drums of industrial chemical wastes, tankers of liquid chemicals, and containers of chemical sludges that were transshipped from the facilities of Scientific Chemical Processing Company ("SCP") in Newark and Carlstadt, New Jersey. In 1978, a large fire broke out at the landfill. This led to an investigation by the New Jersey Department of Environmental Protection ("NJDEP"), and the subsequent closing of the landfill in 1979.[1]

In the early 1980's, EPA conducted an investigation of the landfill, and notified parties about their potential liability for the cleanup costs. EPA selected a remedy for the on-site contamination on September 28, 1984. The remedy, as described in the EPA's Record of Decision of that date, included capping the landfill to reduce the infiltration of rainwater, erecting a slurry wall around the perimeter of the landfill to control migration of contaminants and groundwater, and installing a groundwater and leachate collection and treatment system to prevent contamination from leaking through and under the slurry wall. The Lone Pine Steering Committee, a group of the eight largest "direct" generators of waste at the site, filed suit in this Court seeking to block implementation of the cleanup plan. The action was dismissed on the ground that EPA's remedial plan could not be reviewed prior to its enforcement. *Lone Pine Steering Committee v. EPA*, 600 F.Supp. 1487 (D.N.J.), *aff'd*, 777 F.2d 882 (3d Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

Negotiations among the potentially responsible parties ("PRPs") were slow and complex, made difficult in part by the lack of complete records as to the dumping that occurred at the landfill. In December, 1988, EPA informed representatives of the various PRPs that they had until May 15, 1989 to reach a settlement to implement the remedy. The consent decree, lodged with this Court on August 25, 1989, attempts to settle the action in light of the time pressures imposed by EPA and the lack of information concerning responsibility for the waste. Under the consent decree, the settling defendants have been placed into four categories for the purpose of determining their obligations for fund-

---

1. NJDEP filed suit in state court against the Lone Pine Corporation and its principals in October, 1979. This action has been stayed pending resolution of EPA's CERCLA activity. In October, 1989, NJDEP also filed an action in this Court pursuant to § 107(a) of CERCLA, seeking to recover its past response costs expended at the site against seven generators who are signatories to the Consent Decree and whose wastes were sent to the landfill. *See New Jersey Department of Environmental Protection v. Brockway, Inc.*, Civ. No. 89–4368(GEB).

ing the remedy, participation in decision-making under the agreement, and responsibility for payment of any stipulated penalties.

The first category of settling defendants consist of eight "primary settling defendants" whose waste was taken directly to the Lone Pine Landfill and whose waste volume was determined to be in excess of 1% of the waste at the site. The primary settling defendants are jointly and severally liable for funding and performing the remedial action at the site, and for providing financial assurance of the settlors' ability to complete the work. The primary settling defendants' exact share of liability is to be determined through an alternative dispute resolution ("ADR") procedure prescribed by a separate agreement. These settlors also must pay any stipulated penalties for violations of the cleanup provisions of the decree.

The second category of PRPs under the agreement are fifteen "secondary settling defendants." This group includes thirteen defendants whose waste went directly to the Lone Pine site and whose waste volume constituted 0.1% to 1% of the total waste, as well as two defendants whose waste arrived at Lone Pine after being trans-shipped by SCP. The secondary settling defendants are also jointly and severally liable for funding and performing the cleanup. Their liability also will be determined by the ADR process. The secondary settling defendants, however, are not obligated to pay any stipulated penalties.

The third group consists of twenty defendants, whose waste was dumped directly at the Lone Pine site and whose waste volume does not exceed 0.1%. This group, the "direct user buyout defendants," will pay a fixed amount to the fund based upon their assessed volumetric share.

The fourth group consists of eighty SCP customers who sent liquid or sludge waste in drums, bulk liquids or solvents for recovery, or unknown bulk or containerized waste to SCP, indeterminate amounts of which ended up at the Lone Pine site. These defendants, known as the "SCP buyout defendants," will pay a fixed amount based on their volumetric share plus an administrative fee.

As consideration for entering into the consent decree, the four groups of settling defendants will receive a covenant from the United States not to bring any civil or administrative action under RCRA or CERCLA concerning the Lone Pine Landfill. Pursuant to § 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), the settling defendants each will receive contribution protection from all other parties concerning the site.

The Intervenors oppose entry of the consent decree primarily on fairness grounds. The sixteen intervenors exclusive of Freehold Cartage argue that the decree is unfair because it places a burden on them that is disproportionate to their volumetric share of the waste. These defendants also argue that the United States did not meet its obligation to negotiate in good faith with the Intervenors, in that it delegated away its negotiating responsibilities to the Lone Pine Steering Committee. These defendants finally contend that entry of the consent decree would not be in the public interest. Freehold Cartage argues that the Steering Committee's interim allocation of liability unfairly precluded it from participating in the settlement agreement, and that the United States arbitrarily precluded it from participating on terms negotiated with other settlors.

ANALYSIS

■ Resolution of this matter depends heavily on this Court's interpretation of its scope of review over the consent decree. The subject has been treated exhaustively by Chief Judge Gerry in his recent opinion in *United States v. Rohm & Haas Co.*, 721 F.Supp. 666 (D.N.J.1989). It is undisputed that, as a matter of law, a court should approve entry of a consent decree only when it is fair, adequate, reasonable, and consistent with the Constitution and the mandate of Congress. *Id.* at 680. Review under this standard does mean the approval must be a rubber stamp; yet, at the same time, review must stop short of the detailed and thorough investigation that

Court would undertake if it were trying the case. *Id.* As Chief Judge Gerry explained:

> Our task is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of liability appropriately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolution.

*Id.*

■■■ In evaluating the reasonableness of the consent decree in *Rohm & Haas,* the Court relied on a six-factor test: 1) the relative costs and benefits of litigating the case under CERCLA; 2) the risks of establishing liability on the part of the settlors; 3) the good faith efforts and adversarial relationship of the negotiators who crafted the settlement; 4) the reasonableness of the settlement as compared to the settlor's potential volumetric contribution; 5) the ability of the settlors to withstand a greater judgment; and 6) the effect of the settlement on the public interest as expressed in CERCLA. *Id.* at 687. The public interest deserves considerable weight in making a determination of reasonableness. *See id.* If the proposed decree is reasonable in light of these factors, the Court need not consider the fairness of the decree to non-settling parties. *Id.; see In re Acushnet River & New Bedford Harbor,* 712 F.Supp. 1019, 1029 (D.Mass.1989) ("An evaluation of the Proposed Decree which overemphasized the importance of its potential effect on the non-settlors ... would frustrate the statute's goal of promoting expeditious resolution of harmful environmental conditions."). A settlement may be deemed unreasonable, on the other hand, if it is based on a clear error of judgment, a serious mathematical error, or other indicia that the parties did not intelligently enter into the compromise. *Rohm & Haas,* 721 F.Supp. at 686.

Public policy, as reflected in CERCLA, clearly favors settlement of this case. Under this consent decree, the settling parties will pay for the entire cost of the cleanup. This result is far preferable to creating the risk that EPA will have to rely on Superfund monies to effect the cleanup. As stated in *Rohm & Haas,* "Congress was aware when it enacted CERCLA that the Superfund provided only a limited source of fiscal resources to be used to protect and restore the nation's environment and that the cost of necessary response activities would greatly exceed the capacity of the fund." *Id.* at 696. Thus, approval of this decree will serve Congress' intent that the costs of the cleanup lie with the responsible parties. *Id.* Also important, approval of the consent decree will ease the strain of the cleanup on public enforcement resources and this Court. EPA has served CERCLA's purpose in finding private parties responsible for the environmental hazard, and negotiating for their payment of the cleanup costs. This goal should not be thwarted absent overriding fairness concerns.

The Intervenors' arguments, taken together, suggest two areas in which they feel the consent decree is unfair: the consent decree's allocation of responsibility for the cleanups, which they argue should be based only on a PRP's volumetric share, and EPA's decision to have the settling parties propose the terms of settlement with the Government. Both of these concerns are meritless.

■■■ The Court reviews the consent decree's allocation of damages in light of the dual principles that the scope of review does not allow for a *de novo* examination of the liability allocation, and that a compromise settlement such as this necessarily is caused by some degree of uncertainty as to each party's liability. It is not our function to determine whether a better settlement could be calculated, but only whether the existing settlement is reasonable. A more intrusive role would prove unduly burdensome and contravene Congressional intent by having this Court substitute its judgment for that of the statutorily appointed representatives of the public interest, EPA and the Department of Justice. *Rohm & Haas,* 721 F.Supp. 685–86.

■ The Intervenors would have this Court assume such an intrusive role. Their chief complaint is that the settlement is unfair because they will be forced to pay an amount of money disproportionate to their volumetric share. This argument, however, does not consider that a PRP's liability under the settlement agreement may depend in part on the toxicity of the waste attributed to it. Indeed, the settling defendants developed the ADR procedure precisely because the PRPs could not determine exactly how to distribute liability among the chief PRPs within the time limits set by EPA.[2] It is beyond any real dispute that toxicity is an important factor that EPA may consider in entering into consent decrees. *See* 42 U.S.C. § 9622(e)(3); 52 Fed.Reg. 19919, 19920 (1987). That the consent decree reflects a determination of liability based on toxicity as well as volumetric share does not render the decree unfair.

The Intervenors also claim that, even if toxicity is a relevant factor, the toxicity of their waste has not been determined to be significantly greater than any of the settling defendants. Consequently, they argue, they should have been offered an opportunity to pay a flat fee in settlement of the claims against them. The Court, however, will not make an independent evaluation of the relative toxicity of the Intervenors' waste as compared to the settling defendants' waste. This inquiry is well beyond our scope of review.

Moreover, the Intervenors' concerns over potential liability are speculative. The Intervenors anticipate that, if the decree is entered, they will be forced to pay a disproportionate share; at this time, however, there is no finding of liability against them. Assuming that the United States and the settling defendants seek recovery from the Intervenors, the amount of that recovery will be determined by judicial proceedings. Such proceedings will provide the Intervenors with any procedural and substantive protections to which they are entitled as a matter of law. Also, the liability imposed on the primary and secondary settling defendants pursuant to the ADR process will affect the Intervenors' potential liability, as will any future decisions by EPA or the settlors to pursue any other PRPs not named in either the *Acton* or *Armstrong World* actions. Accordingly, the Court does not find the terms of the consent decree to be unfair.

■ Finally, the Intervenors contend that the decree is unfair because EPA did not negotiate with them in good faith. The Intervenors argue that EPA improperly delegated its authority to the Lone Pine Steering Committee, and did not conduct a reasonable, independent review of the settlement proposal. This argument is meritless as well. EPA's practice of negotiating with a representative group of PRPs, then having them resolve the details of the settlement among themselves, is a practical and reasonable process for achieving settlements. The alternative, having EPA negotiate individual settlements with each PRP (in the Lone Pine case, over 300 PRPs) would in fact vitiate the clear Congressional preference for settlements under CERCLA. Moreover, it appears that EPA actually met with the Intervenors on several occasions, and that the Intervenors attended all the consent decree negotiations until May 15, 1989, when they declined to join the settlement. *See* Feldstein reply aff. at paras. 13, 18, 21. In light of these facts, the Intervenors have not convinced us that their views were excluded from the negotiation process.

Neither are we persuaded that EPA in any way merely rubber-stamped the settle-

---

**2.** The ADR procedure provides for, *inter alia*, the selection of an independent arbitrator who will base his or her determination on the standards of liability applicable and the defenses available under CERCLA; the volume of the waste sent to the site by the party; the toxicity, mobility, persistence, ignitability, corrosivity, reactivity, volatility and flammability of the party's waste; and any other factor deemed fair and equitable by the arbitrator. Each of the parties participating in the ADR process will have an opportunity to conduct discovery in a manner similar to that provided by the Federal Rules of Civil Procedure, and will have the opportunity to submit briefs. Evidentiary hearings are also permitted if the arbitrator deems it necessary. *See* Settling Defendants' moving brief at Ex. B.

874

ment proposal, or that the method for dividing PRPs into four groups was unreasonable. The Intervenors contend that EPA would have approved any settlement agreement that would allow the Lone Pine cleanup to be included in the statutorily mandated 175 remedial starts by October, 1989. This argument is flawed, however, as EPA had already budgeted the use of Superfund monies to clean up the site, in case a settlement had not been reached. *See* Feldstein reply aff. at para. 8. Moreover, the division of PRPs into the four groups outlined above is reasonable, especially considering the lack of records concerning ownership of the waste, and creation of an ADR procedure, which will ensure that the PRPs subject to it will have an opportunity to state their position to the arbitrator before any liability is assessed.

In conclusion, the consent decree reached between the *Acton* defendants and EPA is a reasonable, adequate, and fair settlement of the liability issues raised by the cleanup of the Lone Pine Landfill. The essence of the Intervenors' position is that the decree is unfair because they may have to pay more money than they wish. The position is insufficient to upset the settlement. In light of the strong Congressional policy favoring settlement of CERCLA claims, the Court must approve entry of the consent decree.