The **DISSTON COMPANY, Plaintiff,**

v.

**SANDVIK, INC., Defendant.**

**Civ. A. No. 90–0030–D.**

United States District Court, W.D. Virginia, Danville Division.

Sept. 21, 1990.

James F. Stutts, J. Jon Jewett, III and Margery Bugen, McGuire, Woods, Battle & Boothe, Richmond, Va., for plaintiff.

Timothy G. Hayes, William J. Dinkin, Clayton L. Walton, Hazel, Thomas, Fiske, Weiner, Beckhorn & Hanes, Richmond, Va., Robert R. Salman, Beth D. Jacob, Robert C. Malaby, Carter, Ledyard & Milburn, New York City, for defendant.

## MEMORANDUM OPINION

KISER, District Judge.

This matter is before me on defendant's motion to dismiss, or in the alternative, to compel arbitration, and on plaintiff's motion for preliminary injunction. All motions were argued on September 10, 1990, and the matter is now ripe for disposition. The underlying dispute in this case involves both a leveraged buyout and CERCLA liability for hazardous waste storage. The factual background of this dispute is fairly complex, and will be described in some detail.

### I. *Financial Background*

Plaintiff Disston Company owns and operates a manufacturing plant producing hand tools on an 89 acre property near Danville, Virginia. It now has over 250 employees and annual revenues of approximately $40 million. Although the plant has been in continuous operation for over 30 years, its ownership has changed hands many times.

The Disston factory was built in 1959 by H.K. Porter Company, Inc. Porter operated Disston as a wholly-owned subsidiary until 1972. In 1972, Porter sold all of its shares in the company, and it was publicly traded until 1976, when Defendant Sandvik, Inc., a Swedish corporation, purchased substantially all of the shares. In 1978, Disston was formally merged into Sandvik. Sandvik hired Henry Libby to be Chief Operating Officer of the Disston Division, in 1980.

In 1982, Libby purchased the Disston Division in a highly leveraged buyout. Libby is now the Chairman, President, and sole shareholder of Disston, but is not a party to this action. In addition to a cash payment financed by a bank loan, Disston made partial payment by giving Sandvik a $5,162,000 promissory note, secured by the Disston real property, machinery and equipment. In the Sale of Assets Agreement, Sandvik agreed to indemnify Disston for any hazardous liability it might incur as a result of pre-existing conditions on the property. The note was originally due to be paid in full by November 30, 1987, but was later extended and modified by agreement between the parties, to become due with a final balloon payment of over $3 million on November 30, 1990. Disston has made all interest payments on the note.

In 1987, Citicorp North America (Citicorp) extended a line of credit to Disston. As a precondition of this loan, Citicorp demanded that it receive a lien on all of Disston's property superior to Sandvik's, and Sandvik accepted this condition. The full balance of $6.6 million was due to Citicorp on August 31, 1990. On that date, Citicorp agreed to forebear collection on

the defaulted credit line for 90 days, providing Disston paid a higher interest rate for that period. During the period of forbearance, Disston is in default on the Citicorp loan. Sandvik cannot foreclose on the Disston property until it pays the debt to Citicorp.

The record also discloses that Disston made an unsuccessful effort to sell its assets to James Neill Holdings, Ltd., in 1987. In 1989, it engaged in a complex transaction with Rule Industries, Inc., whereby Rule loaned $4.5 million to Disston, and in return was granted the right to choose one-half of Disston's board of directors for the duration of the loan.[1] Disston contends that but for the hazardous waste on the property, it would have successfully completed the sale to Neill, and in any event would not be experiencing its current financial difficulties.

## II. *Hazardous Waste Background*

Hazardous waste discharge on the Disston plant site forms the basis of Sandvik's potential liability in this action. The evidence presented in affidavits and through witnesses at the hearing for preliminary injunction discloses that there is a substantial amount of hazardous waste on the site, and that cleanup costs may be in the range of $11–17 million.

The complaint alleges that approximately two 55 gallon drums a month of spent trichloroethylene (TCE) used in degreasing operations was dumped on the property between 1959 and the early 1970s. The first governmental investigation took place in 1977, during the period of Sandvik's ownership. The investigation was instigated by the death of a public works employee on the Disston property, who was overcome by fumes while working in a pumping station. An investigation by the Virginia State Water Control Board revealed that wastewater and sanitary system waste lines were cross-connected. Monitoring also revealed that local groundwater wells were contaminated, affecting the drinking water of some local residents. In response to these problems, Sandvik paid for bringing city water lines to local residents, lined the wastewater tank, and closed the lagoon that had been used for dumping waste. Disston alleges that at some time in the late 1970's, approximately sixty 55 gallon drums of liquid wastes were buried behind the plant by Sandvik, and then removed a few days later. Many of the drums were damaged during the removal operation, and the contents spilled into a trench. Also during Sandvik's ownership, several hundred gallons of TCE were spilled near an above-ground storage tank.

In 1986, Disston commissioned an environmental report on the property by Risk Sciences International. This report recommended further testing, which was not done. In 1987, Disston commissioned a more extensive report from CH2M–Hill, which again found that there was contamination on the site, and recommended more extensive study.

In November, 1989, Disston and Sandvik entered into an agreement to jointly pay for a remedial site investigation by ICF International, Inc. This report was not designed to meet governmental specifications for a Remedial Investigation/Feasibility Study required by the EPA. In February, 1990, ICF presented a draft report corroborating the earlier reports, and also documenting greater contamination than had previously been identified. Sandvik refused to approve the draft, and no final report was completed. Neither party has yet begun any actual cleanup of the site.

## III. *Requested Relief*

Disston requests relief from Sandvik on four independent bases. The first claim is the only one invoking federal law. Disston seeks to recover response costs it has incurred as a result of its efforts to determine and monitor the toxic waste on the property. It asserts that the costs it has incurred in relation with the ICF report and

---

1. Sandvik contends that this transaction was actually a merger, and should have triggered Sandvik's right to call in the loan.

other investigations, totaling approximately $220,000, are "response costs" within the meaning of CERCLA, 42 U.S.C. § 9601(25). It seeks this sum, as well as a declaration that Sandvik is liable for all future response costs that plaintiff may incur.

The remaining counts are premised on the laws of Virginia. In the second count, Disston asserts that Sandvik's refusal to accept responsibility for the environmental cleanup costs constitutes a breach of the 1982 Sale of Assets Agreement. Disston seeks both direct and consequential damages on this contract claim. In the third count, Disston asserts that Sandvik's failure to inform it of the extent of toxic waste on the property at the time of the sale of assets constituted a breach of the duty of good faith and fair dealing. The final count is premised on negligence. Disston contends that Sandvik's failure to operate the facility with reasonable care caused the environmental damage, and that Disston has suffered injury as a proximate result of this negligence.

### IV. *Motion to Dismiss and/or Compel Arbitration*

In the Motion to Dismiss, Sandvik argues that this entire controversy is subject to arbitration. The 1982 Sale of Assets Agreement included a very broad arbitration clause:

> Any controversy or claim arising out or relating to this Agreement or the breach thereof shall be settled and finally determined by arbitration in New York, New York, or at such other location as the parties may agree, in accordance with the Commercial Arbitration Rules of the American Arbitration Association now in force or hereafter adopted.

There is one listed exception to the arbitration clause for controversies related to the purchase price. Sandvik argues that because the matter is subject to binding arbitration, there is no justiciable controversy, and the Complaint should be dismissed.

■ The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the procedure that courts should follow where a controversy is arbitrable. As Disston notes, dismissing an action on account of an arbitration clause is inappropriate. Instead, "the court in which suit is pending ... shall on application of one of the parties stay the trial of the action until such arbitration has been had ..." Sandvik requested at oral argument that its motion to dismiss be treated in the alternative as a motion to compel arbitration.

Disston's argument that Sandvik has waived its right to arbitration cannot withstand scrutiny. Sandvik first raised the question of the right to arbitration at the earliest possible moment, in its Motion to Dismiss. See Motion to Dismiss, ¶ 6. Although this was not styled a Motion to Compel Arbitration, it provided sufficient notice to make Disston aware that Sandvik believed that the controversy should be resolved through arbitration. None of Sandvik's subsequent actions in this litigation were inconsistent with the belief that the controversy should not be considered by this Court. In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983), the Supreme Court directed federal courts to decide all questions on the applicability of an arbitration clause, including questions of waiver, in favor of arbitration. Accordingly, I find that there was no waiver.

■ The only remaining issue is whether all of the claims in the Complaint are subject to arbitration. No reported cases consider whether or not CERCLA claims may be subject to binding arbitration clauses. The Supreme Court has held that the fact that a claim is based on statute rather than a contract does not render it nonarbitrable. The Supreme Court has recently approved of arbitration to settle disputes arising under a wide variety of statutes. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (Sherman Act); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (Securities Exchange Act of 1934 and RICO); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477,

109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (Securities Act of 1933); see also *Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195 (4th Cir.1990) (in view of recent Supreme Court precedents, claim under the Age Discrimination in Employment Act arbitrable). To avoid arbitration, "The burden is on the party opposing arbitration ... to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *McMahon*, 482 U.S. at 227, 107 S.Ct. at 2337. Disston has not met this burden.

There is no mention of arbitration in the text of CERCLA, nor, apparently, in the legislative history. However, in 1986, Congress amended CERCLA to authorize arbitration of claims of the United States worth less than $500,000. 42 U.S.C. § 9622(h)(2). This provision evidences a Congressional intent favoring arbitration. At least one court has approved a settlement of a CERCLA case that relies on an "alternative dispute resolution" to determine the liabilities of individual defendants. *United States v. Acton Corp.*, 733 F.Supp. 869, 871 (D.N.J.1990). Since there is no evidence that Congress disfavors arbitration of a CERCLA claim, and some evidence that both Congress and the EPA approve of arbitration, I will grant Sandvik's Motion to Compel Arbitration with respect to the CERCLA as well as the tort and contract claims. The legal and equitable arguments set forth by Sandvik in support of its Motion to Dismiss should be considered by the arbitrator, so I will not address them.

V. *Motion for Preliminary Injunction*

Although I have referred the substance of this case to arbitration, I retain jurisdiction to consider whether a preliminary injunction is proper. *Merrill Lynch, Pierce, Fenner, & Smith v. Bradley*, 756 F.2d 1048, 1053 (4th Cir.1985). I should issue a preliminary injunction to preserve the status quo, if failing to do so would render the arbitration a "hollow formality." *Id.* Because Disston's assertion of irreparable injury, if proved, would render the arbitration a hollow formality, I turn now to the Motion for Preliminary Injunction.

Disston's Motion for Preliminary Injunction requests relief from its obligation to make a final payment on the note that it owes to Sandvik. This note, with a current value of close to $4 million, is due on December 1, 1990. Disston asserts that the hazardous waste on the property has prevented it from refinancing this debt. Thus, if not for Sandvik's alleged wrongful conduct, Disston would be able to fulfill its obligations under the note. Sandvik has argued that Disston's request for preliminary injunction is insufficient under the standards of the Fourth Circuit, and also asserts a variety of legal and equitable affirmative defenses.

The Fourth Circuit has stated the criteria for issuing a preliminary injunction on several occasions.

Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest.

*North Carolina State Ports v. Dart Containerline Co.*, 592 F.2d 749, 750 (4th Cir. 1979). The four factors are interrelated: if the probability of success on the merits is high, a lower degree of irreparable injury will be sufficient. *Id.*

The irreparable harm, which Disston seeks to prove, is that because of the environmental problems and because of the outstanding note to Sandvik, it cannot obtain new financing to satisfy its obligation to Citicorp. For these reasons, Disston moves the Court for a preliminary injunction to prevent Sandvik from demanding payment on the note at some future time. The motion for preliminary injunction is not well-taken because Disston has failed to prove that the injunction would prevent the irreparable harm of which it complains.

The injunction would, in no way, improve or cure the environmental problem which presently exists at the Disston plant. Thus, if the reason that Disston is unable to obtain new financing is because of that

**750**

problem or because of the potential liability that the problem may create, then an enjoining of Sandvik from foreclosing on its note would not improve Disston's chances of obtaining new financing.

The other reason for the preliminary injunction, according to Disston's motion and argument, is that the outstanding debt, as represented by the note, is preventing it from obtaining new financing and, therefore, the Court should enjoin Sandvik from collecting on the note until the environmental problem can be resolved. Although Disston makes this argument, the proof presented at the hearing failed to sustain it. Nowhere in the evidence does it appear that financing was rejected because of the debt due to Sandvik. The closest that Disston comes to connecting the debt with the failure of new financing is in the letter from Congressional Financial Corporation. The letter mentions a concern over the possibility of foreclosure by Sandvik, but the letter nowhere promises that a loan will be forthcoming if foreclosure is prevented. Only Fidelcor Business Credit Corp. made any suggestion that a loan is very likely. The relevant portion of the letter is as follows:

> Based on our review of your request for a $10 million secured line of credit we are prepared to present a proposal to our credit committee, however, we prefer to delay our presentation until after your September 12th court appearance. As you know any proposal which we can offer will be conditioned upon our satisfaction that your operations will be able to reasonably continue uninterrupted and this issue will be more clearly defined after the hearing.

This letter demonstrates only that denying the preliminary injunction will result in Fidelcor's loan development officer declining to make a recommendation to its creditors' committee. Such a recommendation is quite distant from an actual offer of a loan, and yet farther from a loan satisfactory to Disston. Losing this kind of hypothetical chance does not meet the strict legal requirement of "irreparable injury." See *Dan River, Inc. v. Icahn,* 701 F.2d 278, 283 (4th Cir.1983).

Thus, because Disston has failed to prove any irreparable harm in the absence of an injunction enjoining the foreclosure of the note, it has failed to prove one of the crucial requirements for the issuance of an injunction.

ORDER

On September 10, came the parties, by counsel, on the Motion for Preliminary Injunction, Motion to Dismiss, and Motion to Compel Arbitration. Upon consideration, it is hereby ADJUDGED and ORDERED that:

1. The Defendant's Motion to Dismiss is DENIED;

2. The Defendant's Motion to Compel Arbitration is GRANTED; and

3. The Plaintiff's Motion for Preliminary Injunction is DENIED.