UNITED STATES of America,
Plaintiff,

v.

City of GRAND RAPIDS, MICHIGAN,
et al., Defendants.

No. 1:99CV388.

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 11, 2000.

## OPINION

ROBERT HOLMES BELL, District Judge.

The United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed this action under sections 106 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9606 & 9607, to address the environmental cleanup of the Butterworth No. 2 Landfill Superfund Site ("Site") in Grand Rapids, Michigan. On March 30, 2000, the EPA filed a motion for entry of the proposed Consent Decree that was lodged with the Court on May 21, 1999. The Proposed Consent Decree has been signed by fifty-three entities.

On April 26, 2000, this Court granted eighteen non-participating entities who face potential liability for environmental cleanup of the Site leave to file objections to entry of the Consent Decree. The Intervenors[1] object to the Proposed Consent Decree as arbitrary, capricious and not in the public interest, as well as being contrary to CERCLA and EPA administrative settlement policies.

### I.

The Site, comprising 180 acres, is a former landfill operated by the City of Grand Rapids, for both residential and industrial waste. The principle contaminants at the Site include arsenic, beryllium, chromium, polynuclear aromatic hydrocarbons ("PAHs"), polychlorinated biphenyls ("PCBs"), 1,1–dichloroethane, and vinyl chloride. The EPA placed the Site on the National Priorities List in 1982. In 1986 five Potentially Responsible Parties ("PRPs") entered into a Consent Decree with the EPA to conduct a Remedial Investigation and Feasibility Study. In 1993 the same five PRPs drafted the Remedial Design for the implementation of the remedial action embodied in the EPA's 1992 Record of Decision ("ROD"). The Remedial Action ("RA") was amended in 1998.

In January and April of 1998 the EPA sent out special notice letters to eighty-one PRPs, including fourteen of the eighteen Intervenors, inviting them to perform the Remedial Action at the Site. The original participating PRPs invited all the PRPs who received the special notice letter to join together to conduct a voluntary, non-binding allocation, and to effect a settlement of potential liability with the EPA and among PRPs.

Intervenors declined to join the PRP Group, choosing instead to negotiate separately with the EPA. They contended that their contribution to the hazardous substances to the Site was *de minimis* and that they should accordingly be afforded a special discounted settlement under CERCLA § 122(g). The EPA declined to offer a *de minimis* settlement to the Intervenors or to any other PRPs.

The PRPs who signed the Proposed Consent Decree include fourteen Settling Work Defendants who have agreed to set-

---

1. The Intervenors are Butterworth Hospital (n/k/a Spectrum Health—Downtown Campus); Dickenson Press, Inc.; Smiths Industries (f/k/a Lear Siegler Instruments Division); The Leslie Metal Arts Co., Inc. (a/k/a LESCOA, Inc.); Blodgett Memorial Medical Center (n/k/a Spectrum Health—East Campus); Ferguson Hospital (n/k/a Spectrum Health—East Campus); Grand Rapids Die Casting Corp.; Keeler Brass Co.; Kindel Furniture Company; Knape and Vogt Mfg. Co.; Meijer, Inc.; Osteopathic Hospital (n/k/a Metropolitan Hospital); Oliver Machinery; P.B. Gast & Sons Co., Inc.; Rospatch Corp. (n/k/a Ameriwood Industries); St. Mary's Hospital; Stephenson & Lawyer, Inc.; and Valley City Plating Co. (collectively the "Intervenors").

tle their potential liability by committing to perform the cleanup specified in the consent decree, and thirty-nine Settling Cash Defendants who have agreed to settle their potential liability by paying cash rather than doing the work. The cost of cleaning up the Site is currently estimated at $31 million. The fifty-three Settling Defendants have already incurred $11 million in past costs, and under the Consent Decree they have agreed to incur approximately $18 million of the estimated $20 million remaining costs of the remedy. The $2 million carved-out portion is to be sought from non-settling parties. The $29 million in costs the Settling Defendants have agreed to pay represents approximately 91.5% of total Site costs. If the non-settling parties do not cover the $2 million carved-out portion, the settling parties will cover it, and then seek contribution from the non-settling parties.

Notice of the Proposed Settlement was published in the Federal Register. The public comment period expired on July 16, 1999. The government received one comment on behalf of eighteen non-settling parties. On March 29, 2000, the United States moved for entry of the Consent Decree. The eighteen non-settling parties were granted permission to intervene, and they have filed objections to entry of the Consent Decree.

## II.

■ Congress has determined that the congressional purpose of protecting and preserving public health and the environment is better served through settlements which provide funds to enhance environmental protection, than through the expenditure of limited resources on protracted litigation. *State of Ariz. v. Motorola, Inc.,* 139 F.R.D. 141, 145 (D.Ariz.1991) (citing *In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1019, 1028–29 (D.Mass. 1989)). Accordingly, Congress has specifi-cally authorized the EPA to enter into consent decrees with PRPs to perform any response action.

> Whenever practicable and in the public interest, as determined by the President, the President shall act to facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation.

42 U.S.C. § 9622(a). EPA's decision to enter into a consent decree represents a selection by the President of a remedy as authorized by § 9604(c)(4). *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1424 (6th Cir.1991). Accordingly, judicial review is governed by § 9613(j). Review is limited to the administrative record, and the court is not permitted to engage in a de novo review of the evidence. 42 U.S.C. § 9613(j)(1); *Akzo,* 949 F.2d at 1424. This Court's role, "as the CERCLA statute makes clear, is one of review on the administrative record, searching for errors of procedure and for glaring omissions or mistakes which indicate that EPA has acted arbitrarily and capriciously." *Akzo,* 949 F.2d at 1424.

■ CERCLA requires that a proposed consent decree be lodged in the district court. 42 U.S.C. § 9622(d)(1)(A). The decree cannot be entered unless the court first approves it. "The requirement of court approval is intended to help insure that the proposed settlement will serve the public interest by facilitating restoration of the environment and by adequately compensating the taxpayers for the cleanup costs that will be incurred." *United States v. Davis,* 11 F.Supp.2d 183, 188 (D.R.I. 1998).

■ Consent decrees are cloaked with a presumption of validity. The general policy of the law to support voluntary settlements is enhanced where the EPA enters

into consent decrees with PRPs because the EPA is charged with the implementation and review of the environmental statutes the EPA is committed to the protection of the public interest, and because the settlement has been worked out by sophisticated parties with sharply conflicting interests. *Cannons*, 899 F.2d at 84.

■ In reviewing consent decrees under CERCLA, this Court need only "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." *Akzo*, 949 F.2d at 1424 (quoting H.R.Rep. No. 253, Pt. 1, 99th Cong., 1st Sess. 81 (1985), reprinted in 1986 U.S.Code Cong. & Admin.News 2835, 2863). This standard of fairness, reasonableness and consistency with the statute, coupled with the arbitrary and capricious standard of § 9613(j), is the proper test for reviewing the EPA's proposed consent decree. *Akzo*, 949 F.2d at 1426. "While the district court should not mechanistically rubberstamp the agency's suggestions, neither should it approach the merits of the contemplated settlement de novo." *Akzo*, 949 F.2d at 1424 (quoting *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)).

■ In determining whether a decree is "fair," courts have considered "the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Akzo*, 949 F.2d at 1435 (citations omitted). The key consideration in assessing whether a decree is fair, reasonable and adequate under the statute is the public interest. *Akzo*, 949 F.2d at 1435. While the effect of the judgment on other parties and non-parties is a factor to be considered, the concerns of non-parties to the dispute is not determinative. *Id.* at 1435 (citing *United States v. Cannons Engineering Corp.*, 720 F.Supp. 1027, 1040

(D.Mass.1989), affd., 899 F.2d 79 (1st Cir. 1990)).

### A. Procedural Fairness

■ Intervenors contend that the Proposed Consent Decree is procedurally unfair and inconsistent with processes imposed by CERCLA because Plaintiff excluded Intervenors from the settlement process.

■ In determining whether a proposed settlement is procedurally fair the Court "should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons*, 899 F.2d at 86. Generally, the requirement of procedural fairness is satisfied if the proposed settlement is reached through arms-length negotiations in which all parties, including non-settlors, are afforded an opportunity to participate and the United States acts in good faith. *Id.* at 87.

The consent decree in this case arose out of the efforts of a group of PRPs who joined together and requested assistance in the allocation process by a neutral evaluator, John M. Barkett. The PRP Group members contributed monies per capita to fund the allocation work, with an agreement for a later reallocation of monies once the allocation was finalized. Barkett Affidavit, ¶ 4. All PRPs who could be located were invited to join the BLCP Group. Barkett Affidavit ¶ 5. Determining waste contribution at this site has been difficult because not many landfill records could be found that would document waste-in. Evidence of each member's Site nexus was accordingly dependent on the testimony of witnesses and confidential questionnaire responses by Group members. (Ferroli letter of April 6, 1998); Barkett ¶ 12. Mr. Barkett prepared a waste-in summary for every PRP based on the testimony, questionnaires, and the Site invoice documents

that had been located. Barkett ¶ 12. The PRP Group conducted the allocation process under a resolution which specified that all submittals made and all reports generated by the neutral evaluator would remain confidential. Barkett ¶ 18. Because the process required parties to self-report information, confidentiality was essential to the allocation process. Those who joined the PRP Group and subjected their claims of only limited involvement at the Site to the review of an objective allocator, were still not bound to settle with the EPA if they disagreed with the results of the allocation. The PRP Group eventually negotiated a settlement with the EPA, under which the PRP Group will pay over 91.5% of all response costs. The PRP Group has a potential liability under the Consent Decree for 98% of all response costs because they are obligated to perform the $2 million of carve-out work if the non-settling parties fail to do so.

Intervenors' own recital of the settlement process and exhibits in support of their objections belie their contention that they were excluded from this settlement process. Intervenors admit that they have been in regular contact with the EPA in attempts to settle the claims against them. On April 3, 1998, Intervenors submitted written "good faith offers" to participate in further negotiations with the EPA and other PRPs. They submitted further "good faith offers" to the EPA on June 1 and 2, 1998. They met with the EPA's attorneys in Chicago to discuss their alleged liability for the contamination at the Site on June 11, 1998. On July 21, 1998, the EPA sent Intervenors a notice of receipt of their offers and an invitation to join in a settlement discussion on August 4, 1998. On August 28, 1998, counsel for the City of Grand Rapids wrote counsel for the Intervenors to encourage continuation of settlement discussions and to propose a $5 million settlement figure. On September 2, 1998, Intervenors participated in the post-

poned settlement negotiation meeting with the EPA. On September 15, 1998, Intervenors participated, via conference call, in a further settlement meeting held in Chicago. During this settlement conference the EPA informed Intervenors that because of the lack of credible evidence as to the amount and type of waste contributions for each of the parties, there would be no *de minimis* settlements for the Site, that the EPA would only negotiate with the participating PRPs, and that Intervenors must negotiate any settlement with and through the participating PRPs. On November 17, 1998, the EPA wrote counsel for the Intervenors advising that the EPA had repeatedly rejected as insufficient the Intervenors' case in support of a *de minimis* settlement. The EPA advised that one of the principle criteria in determining the appropriateness of *de minimis* settlements is adequate documentation of waste contributions (volume and toxicity). Where, as in this case, the data is insufficient, the site should generally not be considered a candidate for *de minimis* treatment. Nov. 17, 1998, letter from EPA to Michael F. Kelly.

By letter dated March 5, 1999, Intervenors were again invited to join in the settlement, by submitting a signed signature page to the Consent Decree by March 24, 1999. When some of the Intervenors indicated an interest in entering into further negotiations based upon those demands, they were notified that the new deadline for entering into the Consent Decree was March 17, 1999. None of the Intervenors submitted signature pages as of the March 17, 1999, cut-off date for finalizing the parties to the Consent Decree. The cut-off date was eventually extended to April 13, 1999. Intervenors were advised on April 20, 1999, that the Consent Decree had not yet been lodged, and that there might be an opportunity for additional participation. Eight of the Intervenors filed acceptances, but they were rejected by the

EPA on the basis that they were untimely, and would require recalculation of the "carve-out" settlement share.

Intervenors complain that they never received a written response to the individual settlement proposals they submitted. They do not allege that they never received a response, only that they never received a written response. The Court is aware of no requirement that the EPA respond to all good faith offers in writing. But even if there were, there is no question in this case that the Intervenors did in fact receive a written response to their offers on November 17, 1998.

█ Intervenors apparently believe they are entitled to know in more detail the basis or evidence upon which the EPA relied in denying their request to settle on a *de minimis* basis. The Court is aware of no such obligation on the part of the EPA. In fact, the EPA's decision not to accept a settlement offer is not subject to judicial review. The CERCLA statute clearly provides that a decision of the EPA to use or not use the settlement procedures of § 9622 is not subject to judicial review. 42 U.S.C. § 9622(a). It is evident from the Intervenors' description of the negotiation process that their complaint is with the EPA's rejection of their offer to settle on a *de minimis* basis, rather than with the process itself. No party has the right to compel the United States to settle with it on its own terms, particularly when those terms are *de minimis* treatment. *De minimis* settlements do not contain reopener provisions which leave other settlors exposed to the risk that the remedy they are financing or performing will fail and that additional work will be required.

42 U.S.C. § 9622(f)(6)(A);[2] Consent Decree ¶¶ 81, 82.

The Court finds no evidence in the record to support the Intervenors' assertion that they were excluded from the settlement process. Intervenors declined to enter into the settlement process. They made a tactical decision not to join the PRP Group, attempting instead to negotiate a separate *de minimis* settlement with the EPA. By doing so Intervenors avoided making the detailed disclosures of their Site usage, manufacturing processes, waste streams, and disposal practices called for by the PRP Group's confidential, non-binding allocation process. When Intervenors' efforts at a *de minimis* settlement failed, some of the Intervenors belatedly attempted to enter into the settlement process. By then the EPA was no longer willing to negotiate with the Intervenors. Intervenors' failed strategy is no indication that the settlement process itself was unfair.

█ Even if Intervenors had been excluded from the settlement, such exclusion would not indicate procedural unfairness. CERCLA does not require the EPA to open all settlement offers to all PRPs. In *Cannons* the First Circuit refused to insert such a requirement into the law by judicial fiat. 899 F.2d at 93. Under CERCLA the right to draw fine lines, and to structure the order and pace of settlement negotiations is an agency prerogative. *Id.* "So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses." *Id.* There is no evidence in this record that the EPA did not conduct negotiations forth-

---

**2.** CERCLA provides that where settlements with the government contain a covenant not to sue, the settlement "shall include an exception to the covenant that allows the President to sue such person concerning future liability resulting from the release or threatened release that is the subject of the covenant where such liability arises out of conditions which are unknown at the time the President certifies under paragraph (3) that remedial action has been completed at the facility concerned." 42 U.S.C. § 9622(f)(6)(1).

rightly or in good faith. The Court is satisfied that the Consent Decree is procedurally fair.

### B. Substantive Fairness

 Intervenors contend that the Proposed Consent Decree is substantively unfair, inequitable and not in the public interest because the EPA entered into a "sweetheart" deal with the Settling Work Defendants. Intervenors contend the EPA abdicated its settlement authority and allocation of responsibilities to the PRP Group, without any idea as to the volume of waste that the Settling Defendants contributed to the Landfill.

 Substantive fairness requires that settlement terms "be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Cannons*, 899 F.2d at 87. There is no universally correct approach for measuring comparative fault. *Id.* "Whatever formula or scheme the EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." *Id.*

 The EPA must also be given considerable flexibility in negotiating and structuring settlements so that it may diverge from an apportionment formula in order to address special factors such as the uncertainty of future events and the timing of particular settlement decisions. *Id.* at 87–88. "The Court should give the EPA's expertise the benefit of the doubt when weighing substantive fairness—particularly when the agency, and hence the court, has been confronted by ambiguous, incomplete, or inscrutable information."

*Id.* at 88. The EPA must be permitted to grant a discount for the cost savings associated with an early settlement, a discount for assumption of open-ended risks, or a premium for the benefit of being permitted to cash out and avoid future liability. *Id.* at 88.

Intervenors argue that the decree is unfair from their perspective because the settlement will saddle them with disproportionate liability. They contend that the $2 million worth of "carved out" work, for which they are potentially responsible, does not represent their fair share of liability at this Site.

Although this result may seem harsh and unfair, disproportionate liability is not an indication of substantive unfairness. "[A]ny unfairness is inherent in the statutory scheme and is not a mere byproduct of the consent decree." *United States v. Atlas Minerals and Chemicals, Inc.*, 851 F.Supp. 639, 654 (E.D.Pa.1994).

> In the SARA Amendments, Congress explicitly created a statutory framework that left nonsettlors at risk of bearing a disproportionate amount of liability. The statute immunizes settling parties from liability for contribution and provides that only the amount of the settlement—not the pro rata share attributable to the settling party—shall be subtracted from the liability of the nonsettlors. This can prove to be a substantial benefit to settling PRPs—and a corresponding detriment to their more recalcitrant counterparts.

*Cannons*, 899 F.2d at 91 (footnote omitted). Congress designed the statute so that the threat of disproportionate liability would encourage parties to settle early with the United States and discourage dilatory behavior. *Id.* at 89.

Intervenors contend that the settlement with the City appears to rely on, but to be inconsistent with, the EPA's 1998 Munici-

pal Settlement Policy. Intervenors opine that the City of Grand Rapids is "probably not contributing its fair share" in light of the City's multiple roles as owner, operator, transporter and generator at the time, and current owner of the Site. Intervenors cite *United States v. Alliedsignal, Inc.*, 62 F.Supp.2d 713 (N.D.N.Y.1999), where a Consent Decree based upon the Municipal Settlement Policy was rejected. There is no evidence in this case that the Municipal Settlement Policy was applied. Moreover, *Alliedsignal* is inapposite. In *Alliedsignal* the EPA entered into a Consent Decree with four municipal defendants. The court held that the settlement was substantively unfair because the municipal defendants deposited the majority of the waste at the Site, but the settlement would only require them to pay the cost of capping one of the seventy-four acres at the Site. In contrast to *Alliedsignal*, the settlement in this case encompasses payment of at least 91.5% of the costs of remediation.

Notwithstanding the comprehensive nature of the Consent Decree. Intervenors contend that the City is not paying its proper share of that settlement. Intervenors also contend that the settlement is substantively unfair because the proposed contributions by individual Settling Defendants are unknown and are not established to bear any logical relationship to their proper share of the Site costs.

Courts have rejected Intervenors' argument that disclosure of individual allocation shares of settling parties is required to establish substantive fairness. In *United States v. Charles George Trucking*, 34 F.3d 1081 (1st Cir.1994), the Consent Decrees assigned payment responsibilities to classes of PRPs, leaving the question of allocation amongst the class members to the class members themselves. The Court found no reason to prohibit such an approach. This practice is sufficient because "the ultimate measure of accountability in an environmental case is the extent of the overall recovery, not the amount of money paid by any individual defendant." *Id.* at 1086. "Realistically, a government agency, in the midst of negotiations, is in no position to put so fine a point on accountability. We, therefore, endorse, in general, EPA's practice of negotiating with a representative group of PRPs and then permitting the group members to divide the burden of the settlement among themselves." *Id.* In support of this determination the court cited *United States v. Acton Corp.*, 733 F.Supp. 869 (D.N.J.1990), where the district court observed that "EPA's practice of negotiating with a representative group of PRPs, then having them resolve the details of the settlement among themselves, is a practical and reasonable process for achieving settlements. The alternative, having EPA negotiate individual settlements with each PRP ... would in fact vitiate the clear Congressional preference for settlements under CERCLA." *Id.* at 873. *See also United States v. Kramer*, 19 F.Supp.2d 273, 282 (D.N.J. 1998) (EPA's practice of negotiating an overall settlement with a representative group of PRPs is "well-recognized (and practically imperative)").

It would be impractical for the EPA to determine the relative liability of each individual PRP, particularly where the information is lacking. Moreover, "it would disserve a principal end of the statute—achievement of prompt settlement and a concomitant head start on response activities—to leave matters in limbo until more precise information was amassed." *Cannons*, 899 F.2d at 88.

Under the Consent Decree the EPA has carved out $2 million in costs to be recovered from non-settling parties. As noted above, this Court must determine whether this figure is based upon, and roughly correlated with, some acceptable measure

of comparative fault. *Cannons,* 899 F.2d at 87.

Intervenors contend that it appears that the EPA relied on the PRP Group's characterizations of the volumes allegedly contributed by the Intervenors for the "carve-out" and "global" settlement demand to the Intervenors, and failed to review the "waste-in" evidence as to the Intervenors. The record does not reveal precisely what information the EPA reviewed or relied on in preparing its settlement demands. The EPA's justification for the "carve-out" portion, however, is not based upon estimates of the amounts contributed by the Intervenors. Instead, the EPA has justified this figure by reference to the share of responsibility attributable to insolvent or defunct parties.

The EPA notes that the Settling Defendants will spend approximately 91.5% of the total response costs for the Site. There is no dispute that the Settling Defendants are not responsible for 100% of the contamination at the Site. In addition to several viable responsible parties who chose not to join the settlement, including the Intervenors, there are numerous other parties who are insolvent or defunct. The EPA contends that by simply looking at the reasonable estimate of the share attributable to the insolvent and defunct parties (the "orphan share"), the Court can conclude that the 91.5% share of total costs assumed by the settlors satisfies the test for substantive fairness, because it represents a rational estimate of the harm for which the Settling Defendants are responsible.

According to the Declaration of Douglas Ballotti, the Enforcement Coordinator for the Superfund Division of the E.P.A.'s Region 5 Office, of the eighty-one PRPs who received special notice for the Site, at least twenty-three PRPs were insolvent or defunct, and therefore qualified as orphans under the EPA policy. (Ballotti Declara-

tion ¶ 10). The EPA reviewed the Settling Defendants' waste-in analysis for several of the orphans which demonstrated that the orphans contributed approximately 9.4% of the total hazardous waste at the Site. Based on the fact that the Site was used as a co-disposal landfill, and taking into account the volume of orphan waste, the type of wastes generated by the orphans, the type of landfill, and the landfill's years in operation, Mr. Ballotti concluded that the estimate that the orphans contributed 9.4% of the total hazardous waste at the Site was "extremely conservative." Ballotti ¶¶ 10–14.

The information on orphans provided by the Settling Defendants was contained in an analysis conducted by Brad Blissett of Blissett Consulting, Ltd. Mr. Blissett conducted an independent review of the evidence to determine the orphan share calculation. He concluded that the orphan PRPs account for 15.1% of Site costs if equitable factors are considered, and 6.1% of Site costs if equitable factors are ignored.

Intervenors object to the figure of total waste volume used by Mr. Blissett to calculate the orphan share. Mr. Blissett used a total waste volume of 2.75 million cubic yards, even though other documents show that the total volume of waste at the Site is much higher, in the range of 7 to 11 million cubic yards.

This discrepancy does not demonstrate a problem with the analysis. As the Settling Work Defendants point out, EPA policy on orphans share does not include shares attributable to those parties that the EPA would not ordinarily pursue for cleanup costs, such as *de micromis* contributors, municipal solid waste contributors, and residential homeowners. Since 75% of all waste disposed of at this Site was residential waste, it was proper to count only 25% of the total Site volume for purposes of

applying the orphan share policy. Mr. Blissett used 25% of 11 million cubic yards as the denominator for calculating the percentage of waste-in volume for each party.

Since a reasonable estimate of the share of responsibility attributable to insolvent and defunct parties is at least 9% and at least some additional share of responsibility is attributable to viable non-settling parties, some of whom are the Intervenors, the fact that the settlors are paying all but 8.5% of total Site costs represents a fair resolution of their responsibility for the Site. EPA's finding that 91.5% to 98% of all response costs the Settling Defendants have agreed to pay exceeds their fair share of response cost liability is more than plausibly supported by the substantial orphan share.

Intervenors contend the Consent Decree is substantively unfair because it shifts the orphan share solely to Intervenors.

This argument overstates the evidence. There is no dispute that some of the orphan share has been absorbed by the government. Under EPA policy, there are limits on the amount of forgiveness that the Agency can offer in a particular settlement to account for the orphan share. EPA policy specifies that the maximum amount appropriate for compensating the orphan share component of the federal compromise is the *least* of the following: (a) 25% of the costs of implementing the ROD; (b) the total amount of unreimbursed past costs and anticipated future oversight costs; or (c) the total amount of the orphan share at the site. In this case the EPA has agreed to waive its reimbursed costs and its future oversight costs as orphan share compensation for the Settling Defendants—$693.226.04. Ballotti Affidavit ¶ 7. This figure is appropriate under the EPA orphan share policy. It represents approximately 3.5% of the estimated costs of implementing the ROD, and is the lowest of the three monetary amounts to be considered when determining the maximum amount appropriate for compensating the orphan share under EPA policy.

As to the failure of the Settling Defendants to absorb a larger portion of the orphan share, the Court observes that the amount the Settling Defendants are paying already exceeds a reasonable estimate of the amount of their individual responsibility. To the extent they achieve the benefit of a discount on their pro rata liability for the orphan share as a result of this settlement, it appears to the Court that such a benefit is within the purview of the CERCLA statute. This Court's task "is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of liability appropriately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolutions." *United States v. Union Elec. Co.*, 934 F.Supp. 324, 331(E.D.Mo.1996). In this case, the Consent Decree requires the settling PRPs to pay collectively at least 91.5% of the remediation costs. In light of the litigation costs and time saved by the settlement, the Court is satisfied that the Consent Decree represents a fair settlement, especially in light of evidentiary difficulties.

The Court is satisfied that this Consent Decree is substantively fair. In light of the large orphan share at this Site, it appears that the Settling Defendants will already be overpaying their fair shares. Although the Consent Decree may not precisely reflect the comparative fault of all PRPs at this Site, complete equity cannot be done when the documentation is missing and some parties choose not to partici-

pate in the confidential self-reporting process.

### C. Reasonableness

■ In determining whether a Consent Decree is "reasonable" courts have considered the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent to which the Decree furthers the goals of the statute. *Akzo*, 949 F.2d at 1436. "A district court's reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculations." *United States v. Charter Intern. Oil Co.*, 83 F.3d 510, 521 (1st Cir.1996). "The question is whether the decree provides for an efficient clean-up and adequately compensates the public for its costs, in light of the foreseeable risks of loss." *Id. See also Cannons*, 899 F.2d at 89–90.

■ Intervenors do not challenge the reasonableness of the Consent Decree, and no other entity has submitted any public comments challenging the reasonableness of the Consent Decree. This Court is satisfied that the Proposed Consent Decree is reasonable as it provides for an efficient clean-up and will adequately compensate the public for its costs.

### D. Consistent with Statute

■ The two principal goals of CERCLA are "ensuring prompt effective remedial action while placing the financial burden of the cleanup on the PRPs." *Akzo*, 949 F.2d at 1439. Stated another way, CERCLA's overarching principles are "accountability, the desirability of an unsullied environment, and promptness of response activities." *Cannons*, 899 F.2d at 91. The Proposed Consent Decree is clearly consistent with these statutory goals.

■ Intervenors do not argue that the Proposed Consent Decree will not satisfy the primary goal of CERCLA, protection of the environment. Neither do they argue that the Consent Decree will not ensure prompt response activities. Under the Consent Decree the Landfill will be fully remediated, and the Settling Defendants have already commenced those remediation efforts. Intervenors' only objection to the settlement is that it leaves too much responsibility on the non-settling parties. As discussed above, this Court does not find the allocation to be substantively unfair. The Settling Defendants will be paying their reasonable share of the costs, and the settlement does not impose too large a financial burden on the taxpayers.

### E. Uniform Comparative Fault Act

■ Intervenors suggest that the provisions of the Uniform Comparative Fault Act ("UCFA") should be applied to reduce each non-settling party's liability by the amount of the settling party's liability rather than the settlement amount. Intervenors contend that the EPA should be barred from recovering any shortfall if it settles for less than the Settling Defendants' fair share. Intervenors also seek application of the UCFA to reduce their liability in contribution actions filed by the other PRPs against them.

Intervenors' request conflicts with the plain language of CERCLA. Section 113(f)(2) of CERCLA specifically provides that a settlement with the government "reduces the potential liability of the others by the amount of the settlement."

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its

terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f)(2). "By enacting § 113(f)(2) and § 122(g)(5) of CERCLA in 1986, Congress has plainly indicated that non-settling defendants' contribution claims will be barred, and they will be credited only with the amount of the settlement and nothing more." *United States v. Rohm & Haas,* 721 F.Supp. 666, 677 (D.N.J.1989).

> It would be puzzling indeed if CERCLA, post-SARA, permitted a court to credit a non-settling defendant with the "equitable" share of the liability attributable to defendants who have resolved their liability to the United States or a State via a judicially approved settlement, since sections 113(f)(2) and 122(g)(5) seem much more closely modeled on the UCTA than on the UCFA. One suspects that Congress would have chosen somewhat different words than "reduces the potential liability of the other[ ] [non-settling potentially responsible parties] by the amount of the settlement," to express the view that non-settling parties should have their liability "reduced by the released person's equitable share of the liability."

*Id.* at 677–78.

Intervenors cite *Comerica Bank–Detroit v. Allen Industries, Inc.,* 769 F.Supp. 1408 (E.D.Mich.1991), in support of the proposition that courts apply provisions of the UCFA to CERCLA settlements. *Id.* at 1414. The settlement the court was referring to in *Comerica,* however, was a settlement between two private parties. The parties in *Comerica* acknowledged that § 113(f)(2) does not permit contribution protection in a situation like this where the defendant settles with the State. *Id.* at 1411.

The failure of the Consent Decree to include any mention of the UCFA or other contribution protection does not render the decree arbitrary, capricious, or unfair. To the extent Intervenors seek a modification of the Decree to insert a UCFA provision, the request is beyond the Court's authority. *See* discussion below.

### F. Relief Requested

Intervenors contend the Court should defer entry of the Consent Decree at least until an evidentiary hearing is conducted on the fairness of the Decree. Intervenors contend there are outstanding questions of fact that need to be resolved before the Court can conclude that the apportioned share of costs assigned to the Settling Work Defendants is a fair approximation of comparative fault. In the alternative, Intervenors have requested an in camera review of two evidence binders which they say they have summarized in the Appendix to their brief.

The CERCLA statute clearly provides that judicial review of a Consent Decree "shall be limited to the administrative record." 42 U.S.C. § 9613(j)(1). "The opportunity to object or to argue is not translatable into an unconditional right to have an evidentiary hearing." *United States v. Comunidades Unidas Contra La Contaminacion,* 204 F.3d 275, 279 (1st Cir. 2000). Accordingly, requests for evidentiary hearings are, for the most part, routinely denied at the Consent Decree stage in environmental cases. *Charles George,* 34 F.3d at 1085–86. "While a hearing may be necessary or desirable in special circumstances, such cases are relatively rare." *Id.* (citation omitted). "To allow evidentiary hearings on the call of any party allowed to intervene would delay, complicate, and perhaps jeopardize the timely resolution of the issues." *Comunidades Unidas,* 204 F.3d at 279.

Intervenors have not established that an evidentiary hearing is necessary to a fair review of the Consent Decree in this case.

In addition to an evidentiary hearing, Intervenors have requested modification of the Consent Decree to accept the settlement offers of those Intervenors who have submitted offers, to accept *de micromis* resolutions on behalf of Intervenors which are not more than municipal solid waste contributors, and to order a waiver of contribution protection for the Settling Defendants, and/or to endorse the UCFA contribution principles.

■ The Court rejects these requests as the forms of relief sought are impermissible. The Court has no authority to modify the Consent Decree. "The consent decree, as a judicial act, requires court approval. However, the court's role is limited to approval or rejection of the decree, and it remains EPA's responsibility to select the remedy and to take the steps necessary to bring the decree to the court for approval." *Akzo*, 949 F.2d at 1425. "We believe section 9613(j) reflects Congress' intent that in this highly technical area, decisions concerning the selection of remedies should be left to EPA, and those decisions should be accepted or rejected—not modified—by the district court under an arbitrary and capricious standard." *Id.*

The Consent Decree lodged with this Court is very comprehensive and reflects a fair allocation of costs to the Settling Defendants. The settlement effects a complete remediation of the property and has carved out a relatively small percentage of the work to be accomplished by the non-settling parties. Accordingly, upon due consideration of Intervenors' opposition, the Court will grant Plaintiff United States' motion for entry of Consent Decree and will enter the Consent Decree lodged with this Court on May 21, 1999, forthwith.